Michael E. Stinn, 21300 Lorain Road, Fairview Park, Ohio 44126, ATTORNEY FOR APPELLANT
Michael C. O'Malley, Cuyahoga County Prosecutor, BY: Anthony R. Beery, Assistant Prosecuting Attorney, 4261 Fulton Parkway, Cleveland, Ohio 44114, For C.C.D.C.F.S.
Pamela A. Hawkins, P.O. Box 43101, Richmond Heights, Ohio 44143, For Children
Robert E. Somogyi, Kuenzi/Somogyi, 1660 West 2nd Street, Suite 660, Cleveland, Ohio 44113, For Paternal Grandmother
Dean A. Colovas, The Brownhoist Building, 4403 St. Clair Avenue, Cleveland, Ohio 44103, Guardian Ad Litem, James H. Schulz, 55 Public Square, Suite 1700, Cleveland, Ohio 44113, For Father.
BEFORE: Celebrezze, J., Boyle, P.J., and Blackmon, J.
JOURNAL ENTRY AND OPINION
FRANK D. CELEBREZZE, JR., J.:
{¶ 1} Appellant, A.L. ("appellant"), brings the instant appeal challenging the trial court's judgment granting permanent custody of her minor children, S.C., M.C., and B.C., to appellee, Cuyahoga County Department of Children and Family Services ("CCDCFS" or the "agency"). Specifically, appellant argues that the trial court abused its discretion in awarding permanent custody to CCDCFS rather than granting legal custody to the children's paternal grandmother or paternal great-aunt, CCDCFS failed to adequately consider placement with a relative as an alternative to permanent custody, and that the trial court's determination that CCDCFS made reasonable efforts to prevent the removal of the children is against the manifest weight of the evidence. After a thorough review of the record and law, this court affirms.
I. Factual and Procedural History
{¶ 2} The instant appeal pertains to the trial court's custody determination with respect to appellant's three children. Appellant is the children's mother, and the children's father is J.E. (hereinafter "Father"). The family moved from Vermont to Cleveland, Ohio in June 2015. Shortly thereafter, CCDCFS became involved with the family.
{¶ 3} CCDCFS filed a complaint on October 22, 2015, alleging that the children were abused and neglected. Along with its complaint, CCDCFS filed a motion for emergency predispositional temporary custody, which the trial court granted. The *817 agency's concerns pertained to the children's inappropriate sexualized behaviors that they were purportedly exhibiting towards each other and other children. The agency was concerned about appellant's failure to address the children's inappropriate behaviors, failure to ensure that the children maintained appropriate hygiene, and failure to meet the children's basic needs. The agency was also concerned about Father's failure to address the children's inappropriate behaviors, Father's own behavior and conduct towards the children, and Father's substance abuse issues.
{¶ 4} During the pendency of the custody proceedings, appellant and Father were arrested in December 2015. In Cuyahoga C.P. No. CR-16-604251,[1] both parents pled guilty in April 2017 to rape, gross sexual imposition, disseminating matter harmful to juveniles, and endangering children, and were sentenced to ten years in prison. All three children were named victims in the criminal case.
{¶ 5} A magistrate held a hearing on CCDCFS's complaint on June 30, 2016. The magistrate adjudicated the children to be neglected and abused, and placed the children in the temporary custody of CCDCFS. The trial court approved and adopted the magistrate's decision on July 22, 2016.
{¶ 6} On September 6, 2016, the children's paternal grandmother, C.C. (hereinafter "C.C."), filed a motion to intervene and a motion for legal custody. The trial court granted C.C.'s motion to intervene on December 21, 2016.
{¶ 7} Based on the parents' incarceration and unavailability to care for the children, CCDCFS filed a motion to modify temporary custody to permanent custody on September 14, 2016.
{¶ 8} Father filed a motion for legal custody to the children's paternal great-aunt, E.K. (hereinafter "E.K."), on January 9, 2017.[2] Appellant filed a motion for legal custody to C.C. on January 30, 2017.
{¶ 9} The trial court held a hearing on CCDCFS's motion for permanent custody on July 19, 2017. CCDCFS presented the following four witnesses: CCDCFS social worker Jamessa Motley, CCDCFS social worker April Long, B.C.'s therapist, Martin Wilin, and M.C.'s therapist, Victoria Ratliff.
{¶ 10} In addition to the agency's witnesses, C.C. and E.K. testified during the permanent custody hearing. The children's guardian ad litem, Jim Schulz (hereinafter "GAL"), submitted a written report and testified during the permanent custody hearing. The GAL recommended that the children be placed in the permanent custody of CCDCFS.
{¶ 11} The permanent custody hearing ultimately concluded on December 14, 2017. On December 19, 2017, the trial court issued judgment entries and findings of fact in which it granted CCDCFS's motion for permanent custody and denied the motions for legal custody to C.C. filed by appellant and C.C. It is from these judgments that appellant filed the instant appeal on December 29, 2017.
{¶ 12} Appellant assigns three errors for review:
I. The trial court abused its discretion in awarding permanent custody to CCDCFS and not to either [C.C. or E.K.] The trial court's orders should be vacated and this matter remanded for further proceedings.
*818 II. The trial court's decision to grant permanent custody to CCDCFS was erroneous as a matter of law and should be reversed due to CCDCFS'[s] failure to give adequate consideration to relative placement as an alternative to permanent custody to CCDCFS.
III. The trial court's finding that CCDCFS made reasonable efforts is against the manifest weight of the evidence as the evidence shows a failure of diligent case planning.
II. Law and Analysis
{¶ 13} In her first assignment of error, appellant argues that the trial court abused its discretion in awarding permanent custody of the children to CCDCFS. Appellant contends that the trial court should have awarded legal custody of the children to C.C. and/or E.K.
{¶ 14} To the extent that appellant argues that the trial court erred by failing to place the children in the legal custody of E.K., we note that E.K. did not file a motion to intervene in the matter or a motion for legal custody, and she is not a party to this appeal. Furthermore, E.K. did not submit and sign a statement of understanding for legal custody pursuant to R.C. 2151.353(A)(3). See In re L.W. , 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, 2017 WL 712808, ¶ 18. Because the trial court did not have authority to grant E.K. legal custody, we summarily overrule appellant's arguments pertaining to E.K. See In re A.D. , 8th Dist. Cuyahoga No. 85648, 2005-Ohio-5441, 2005 WL 2600638, ¶ 14.
{¶ 15} We further note that C.C., unlike E.K., did file a motion to intervene in the case on September 6, 2016. The trial court granted C.C.'s motion to intervene on December 21, 2016. After she was granted intervention, C.C. filed a motion for legal custody. However, she did not file an appeal challenging the trial court's judgment denying her motion for legal custody and granting permanent custody of the children to CCDCFS.
{¶ 16} To the extent that appellant argues that the trial court erred by failing to place the children in the legal custody of C.C., the general rule is that " '[a] parent has no standing to assert that the court abused its discretion by failing to give [C.C.] legal custody; rather, the challenge is limited to whether the court's decision to terminate parental rights was proper.' " In re L.W. at ¶ 23, quoting In re S.G. , 3d Dist. Defiance No. 4-16-13, 2016-Ohio-8403, 2016 WL 7626204, ¶ 52, citing In re Pittman , 9th Dist. Summit No. 20894, 2002-Ohio-2208, 2002 WL 987852, ¶ 70. Accord In re N.M. , 8th Dist. Cuyahoga No. 106131, 2018-Ohio-1100, 2018 WL 1445739, ¶ 23. If permanent custody to CCDCFS is in the children's best interests, legal custody to a relative necessarily is not. In re V.C. , 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, 2015 WL 7777606, ¶ 61, citing In re M.S. , 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, 2015 WL 1276469, ¶ 11.
{¶ 17} Accordingly, appellant's challenge to the trial court's judgment granting CCDCFS permanent custody is limited to whether the trial court improperly terminated her parental rights. With these principles in mind, we will proceed to review the trial court's judgment awarding permanent custody of the children to CCDCFS and terminating appellant's parental rights.
A. Standard of Review
{¶ 18} Parents have a constitutionally protected interest in raising their children. In re M.J.M. , 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, 2010 WL 1500871, ¶ 15, citing *819 Santosky v. Kramer , 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). That interest, however, is " 'always subject to the ultimate welfare of the child.' " In re M.J.M. , quoting In re B.L. , 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, 2005 WL 615642, ¶ 7.
{¶ 19} A juvenile court's termination of parental rights and award of permanent custody to an agency is not reversed unless the judgment is unsupported by clear and convincing evidence. In re Dylan C. , 121 Ohio App.3d 115, 121, 699 N.E.2d 107 (6th Dist.1997) ; In re N.B. , 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, 2015 WL 406036, ¶ 48. " 'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.' " In re T.B. , 8th Dist. Cuyahoga No. 99931, 2014-Ohio-2051, 2014 WL 2025795, ¶ 28, quoting Cross v. Ledford , 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). The evidence must be more than a preponderance, but it does not rise to the level of certainty that is required beyond a reasonable doubt in criminal cases. Cross .
{¶ 20} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B). First, it authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e). In re J.G. , 8th Dist. Cuyahoga No. 100681, 2014-Ohio-2652, 2014 WL 2809032, ¶ 41. Only one of the factors must be present for the first prong of the permanent custody analysis to be satisfied. In re L.W. , 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, 2017 WL 712808, at ¶ 28.
{¶ 21} Second, when any one of the above factors exists, the trial court must analyze whether, by clear and convincing evidence, it is in the best interest of the children to grant permanent custody to the agency pursuant to R.C. 2151.414(D). Id.
B. R.C. 2151.414(B) Factors
{¶ 22} In the instant matter, appellant does not challenge the trial court's finding under the first prong. Appellant acknowledges that the children cannot be placed with either her or Father within a reasonable time due to the parents' incarceration.
{¶ 23} The trial court determined that the condition set forth in R.C. 2151.414(B)(1)(a) was satisfied. Regarding all three children, the trial court found that "the child cannot be placed with [appellant] or Father within a reasonable time or should not be placed with the parent * * * pursuant to [R.C.] 2151.414(E)."
In determining whether a child cannot be placed with his or her parents within a reasonable period of time or should not be placed with his or her parents, courts look to R.C. 2151.414(E) for guidance. Under R.C. 2151.414(E), if the trial court determines, by clear and convincing *820 evidence, that one or more of the factors specified in R.C. 2151.414(E)(1) through (16) exists as to the child's parents, then the trial court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." In re V.C. , 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991 [2015 WL 7777606], [at] ¶ 42.
In re N.M. , 8th Dist. Cuyahoga No. 106130, 2018-Ohio-1099, 2018 WL 1445738, ¶ 24.
{¶ 24} In this case, the trial court found by clear and convincing evidence that the factors set forth in R.C. 2151.414(E)(1), (2), (5), (6), (7)(c), (7)(d), (12), and (14) applied. The trial court's journal entries, which outline the applicable R.C. 2151.414(E) factors, provide, in relevant part:
Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
The Court finds that:
[Appellant] and Father are unable to provide an adequate permanent home for the child at the present time and as anticipated, within one year after the Court holds the hearing in this matter. This is further evidence[d] by [appellant's] and [F]ather's refusal to submit to random urine screens.
[Appellant] and Father are incarcerated for an offense committed against the child or a sibling o[f] the child.
[Appellant] is incarcerated in case CR-604251(A) having pled guilty to [rape, gross sexual imposition, disseminating matter harmful to juveniles, and endangering children.] [Appellant] was sentence[d] to an agreed upon 10 year sentence[.] * * * [Appellant] was also classified as a Tier III Sex Offender. The child in this case [S.C.] was a named victim. This makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the Court holds the hearing in this matter.
Father is incarcerated in case CR-604251(B) having pled guilty to [rape, gross sexual imposition, disseminating matter harmful to juveniles, and endangering children.] Father was sentence[d] to an agreed upon 10 year sentence[.] * * * Father was also classified as a Tier III Sex Offender. The child in this case [S.C.] was a named victim. This makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the Court holds the hearing in this matter.
[Appellant] and Father are unwilling to provide shelter or to prevent the child from suffering emotional, mental neglect as evidenced by their unwillingness to successfully complete the case plan so [they] can provide care for the child.
* * *
[Appellant] and Father are incarcerated at the time of the filing of the [permanent] custody motion and will not be available to care for the child for at least eighteen months after the filing of the Motion for Permanent Custody.
[Appellant] and Father are unwilling and or unable to provide food, clothing, shelter and other necessities of the child.
{¶ 25} Furthermore, the trial court determined that R.C. 2151.414(E)(16) applied, which provides that a trial court may *821 consider "[a]ny other factor the court considers relevant." The court found that the following factor was relevant: "[appellant] and Father have demonstrated a lack of commitment towards the child by failing to provide an adequate permanent home for the child."
{¶ 26} After review, we find that the record clearly and convincingly supports the trial court's determination under R.C. 2151.414(B) that the children could not be placed with appellant or Father within a reasonable time or should not be placed with either parent. Accordingly, we find that the first prong of the permanent custody analysis has been satisfied.
C. Best Interest of the Children
{¶ 27} Appellant's challenge to the trial court's judgment appears to pertain to the second R.C. 2151.414 prong. Appellant appears to argue that the trial court abused its discretion in determining that granting permanent custody to CCDCFS was in the children's best interest. Appellant contends that it was in S.C.'s and M.C.'s best interest to be placed in the legal custody of C.C. Alternatively, appellant contends that it was in S.C.'s and M.C.'s best interest to place one of the girls in the legal custody of C.C. and the other girl in the legal custody of E.K. We disagree.
{¶ 28} Once the juvenile court determines that one of the factors listed in R.C. 2151.414(B)(1) applies, then the court must determine, by clear and convincing evidence, whether permanent custody is in the best interest of the child. In re E.C. , 8th Dist. Cuyahoga No. 103968, 2016-Ohio-4870, 2016 WL 3632537, ¶ 29.
{¶ 29} We review a trial court's determination of a child's best interest under R.C. 2151.414(D) for an abuse of discretion. In re J.F. , 8th Dist. Cuyahoga, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 55, citing In re D.A. , 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, 2010 WL 4684918, ¶ 47. " 'A trial court's failure to base its decision on a consideration of the best interests of the child constitutes an abuse of discretion.' " In re J.F. , quoting In re N.B. , 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 60.
{¶ 30} In determining the best interest of a child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates that the juvenile court consider all relevant factors, including the following:
(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
{¶ 31} While the trial court must consider all best-interest factors, only one of the factors enumerated in R.C. 2151.414(D) needs to be resolved in favor of the award of permanent custody in order for the court to terminate parental rights. In re N.B. at ¶ 53 ;
*822 In re Z.T. , 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, 2007 WL 613998, ¶ 56.
{¶ 32} In the instant matter, we find that the trial court considered the relevant statutory factors. The court's journal entries granting permanent custody of the children to CCDCFS provide:
The Court further finds, based on evidence presented and the recommendations of the Guardian ad Litem for the child and after considering all relevant factors, including but not limited to each of the factors, listed at O.R.C. 2151.[414](D)( [a]-[e] ), that an order of Permanent Custody is in the child's best interest.
The Motion for Legal Custody to Paternal Grandmother [C.C.], pursuant to O.R.C. 2151.42(A) filed by [appellant] and the Motion for Legal Custody to [C.C.] filed on behalf of Paternal Grandmother [C.C.], are denied. Evidence and testimony as well as the report of the Guardian ad Litem show that granting these motions would not be in the child['s] best interest.
The Court further finds that the continued residence of [S.C.] in the home of [appellant and Father] will be contrary to the child['s] best interest and welfare.
The Court further finds that reasonable efforts were made to prevent the removal of the child from the [parent's home] or to return the child to the home, and to finalize the permanency plan, to wit: reunification. Relevant services provided to the family were: Drug and alcohol assessment, complete any treatment or after care, comply with urine screens, basic needs, housing, participate in psychological evaluation through Juvenile Court, and follow all treatment recommendations therefrom. The reason the services were not successful: [appellant] and Father have failed to complete the case plan services and are currently incarcerated for a period of 10 years.
Upon considering the interaction and interrelationship of the child with the child's parents, and foster parents; the custodial history of the child, including whether the child has been in Temporary Custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve (12) or more months of a consecutive twenty-two (22) month period; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of Permanent Custody; and, the report of the Guardian ad Litem, the Court finds by clear and convincing evidence that a grant of Permanent Custody is in the best interest of the child and the child cannot be placed with one of the child's parent[s] within a reasonable time or should not be placed with [the parents]. The Court further finds, based upon the testimony and evidence presented, the recommendation of the Guardian ad Litem for the child and after considering all relevant factors, including but not limited to each of the factors listed at R.C. 2151.414(D)(1)-(5), that an order of Permanent Custody is in the child's best interest.
{¶ 33} After review, we find that the evidence supports the trial court's reliance on the factors set forth in R.C. 2151.414(D) and determination that permanent custody with CCDCFS is in the best interest of the children.
{¶ 34} When CCDCFS took temporary custody of the children in October 2015, the children were put in three separate placements due to the fact that they were exhibiting "sexual acting out behaviors with one another." (Tr. 170.) S.C. and M.C. were placed in separate foster homes, and *823 B.C. was placed in an in-patient residential treatment facility, Ohio Guidestone. (Tr. 34.) The children remained in separate placements at the time of the permanent custody hearing.
{¶ 35} The evidence presented at the permanent custody hearing established that it was not in the children's best interest to be placed together. During oral arguments, appellant's counsel conceded that B.C. could not be placed with his sisters, S.C. and M.C., at the time of the permanent custody hearing. B.C.'s therapist, Martin Wilin, did not recommend placing B.C. with his sisters at the time of the permanent custody hearing because it could lead to "retraumatization" of the girls and be a "horrible psychological burden" for them. (Tr. 197.)
{¶ 36} In support of her argument that it was in the best interest of S.C. and M.C. to be placed in the legal custody of C.C., appellant emphasized that the visits between S.C., M.C., and C.C. had been appropriate, and that the sisters enjoyed the visits and seeing one another. The record reflects that S.C. and M.C. had been able to speak with one another and had limited, supervised visitation. M.C.'s therapist, Victoria Ratliff, testified that M.C. enjoys the time that she spends with S.C. and that the visits between the two sisters have gone well. Nevertheless, we cannot say that the trial court abused its discretion in determining that permanent custody was in the children's best interest.
{¶ 37} Although the visits between S.C. and M.C. had been appropriate and gone well, these visits were limited and closely supervised. The evidence adduced during the permanent custody hearing did not demonstrate that the sisters were ready to have extended, unsupervised visits, much less ready to live together.
{¶ 38} Ratliff, testified that it would be very difficult for M.C. to live with her siblings and interact with them appropriately on a daily basis. Ratliff was uncertain whether the relationship between M.C. and S.C. could reattach with the assistance of family counseling. She opined that over time, S.C. and M.C. could develop a closer relationship. In order for M.C. to live with S.C., Ratliff would recommend family counseling and joint counseling sessions involving both girls and their caregivers. Furthermore, Ratliff recommended increasing periods of time that the girls spent together, having extended daytime visits as well as supervised overnight visits to determine whether the girls could appropriately and comfortably live together.
{¶ 39} Ratliff testified that she has been working with M.C. since March 2017. Ratliff explained that at the time of the permanent custody hearing, M.C. was still unable and/or unwilling to discuss anything related to her family, including appellant, Father, S.C., B.C., and C.C., anything that occurred while she was living with her family, or anything involving her body parts. (Tr. 232.)
{¶ 40} The evidence additionally established that it was not in the children's best interest to discontinue the services they were receiving at their current placements and relocate them to Vermont with C.C. All three children participate in therapy, receive various services, and work with individual counselors.
{¶ 41} M.C. receives psychiatric services and takes medication. M.C. receives therapy and counseling for social skills, building resiliency, coping with trauma, and sexual abuse. Ratliff testified that she has been working with M.C. since March 2017 and that M.C. has made encouraging progress. Ratliff asserted that in order for M.C. to maintain the progress she has made, M.C. needs continued treatment. If M.C.'s treatment is discontinued, Ratliff believes that *824 M.C. would "decompensate," return to having problems regulating her emotions, and her opposition behavior would increase. Ratliff explained that M.C. is easily upset by change and opined that it would be difficult for M.C. to adjust to a new therapist.
{¶ 42} At the time of the permanent custody hearing, B.C. was residing at a residential treatment facility where he received therapy and counseling for anger management, coping skills, and eliminating sexual aggression. B.C. had been working with Wilin for approximately one year. B.C. is very familiar and comfortable with Wilin, and has made progress at his treatment facility. Wilin acknowledged that B.C. could receive the same services and treatment at another facility; however, Wilin opined that it would take a new counselor a while to get "up to speed" with B.C. Based on the progress that B.C. has made, Wilin stated that it may be time for B.C. to move from the residential treatment center to a therapeutic foster home with a foster parent that is specifically trained to deal with some of the issues that B.C. has.
{¶ 43} The record contains clear and convincing evidence supporting the trial court's determination that permanent custody, rather than legal custody to C.C., was in the children's best interest. Initially, we must note that C.C. has expressed and maintained an interest in caring for the children from the time that the custody proceedings were initiated in October 2015. C.C. took extraordinary measures, including making the nine-hour drive from Vermont, to attend custody hearings.
{¶ 44} C.C. had been able to regularly visit the children once a month since February 2016. Motley testified that the visits between S.C., M.C., and C.C. have gone well, the girls interact well with C.C., and C.C. interacts appropriately towards the girls. Ratliff testified that the visits between M.C. and C.C. have gone well and that M.C. has indicated that she has fun during the visits. C.C. has not been permitted to have unsupervised visits because such visits would require out-of-state travel and CCDCFS has not been able to verify that C.C.'s housing is appropriate for the children. The trial court ordered CCDCFS to commence an investigation to determine whether C.C.'s home was appropriate for the children. This investigation had not been concluded at the time of the permanent custody hearing.
{¶ 45} C.C. testified that she currently lives in a four-bedroom house in Vermont with her fiancé, the homeowner, the homeowner's son, and a young man for whom she has been a guardian for approximately 19 years. This young man is on the autism spectrum and has Aspergers Syndrome. Although he does not currently need much supervision as a special needs adult, C.C. still provides care to him and recently applied for guardianship to protect him from being taken advantage of. C.C. and the homeowner have an agreement under which C.C. gets to live in the house in exchange for providing care to the homeowner. The homeowner has been suffering from an early onset of Alzheimer's disease for the past two and one-half years.
{¶ 46} Ratliff opined that it would be overwhelming for one individual caregiver to try and meet the needs of M.C. and the needs of her siblings at the same time. Based on C.C.'s existing obligations to provide care to the homeowner and the young man, we cannot say that it would be in any of the children's best interest to place the children in C.C.'s legal custody. To the extent that appellant argues that legal custody of S.C. should have been granted to C.C., the children's GAL did not recommend separating S.C. and M.C.: "I have a hard time separating the girls out of *825 states, taking one girl and leave the other girl here." (Tr. 338.)
{¶ 47} April Long, who was the case worker of record from November 2015 to August 1, 2016, testified that she met with appellant and Father to discuss different relatives that the children could be placed with. The parents identified C.C. as a possible relative for placement, but Father initially did not want to place the children with C.C. because C.C.'s ex-husband had sexually abus[ed] members of their family." (Tr. 69.) Long spoke with C.C. on November 20, 2015, to determine if C.C. was a suitable placement option. During this conversation, C.C. indicated that her ex-husband had molested one or more of their children.[3] Long was concerned by this information and the fact that C.C. had not been able to protect her children from the abuse. According to the notes that Long recorded during her initial conversation with C.C., C.C. told Long that appellant and Father would have sex in front of their children
{¶ 48} Long determined that C.C. would not be an appropriate candidate to place the children with based on the history of sexual abuse that took place in the family, the children had been traumatized, and Long did not want to place the children back in a home in which they had been previously traumatized or with a family where there had been multiple instances involving sexual abuse. Long also learned that E.K. and a brother of C.C. had also been victims of sexual abuse.
{¶ 49} Long was concerned about the children acting out mentally and sexually. As a result, she explained that she had to take into consideration whether any of the interested relatives had a background that would enable them to address the children's behaviors. (Tr. 147.)
{¶ 50} Motley, who took over as the case worker of record in August 2016, testified that neither appellant nor Father completed the objectives set forth in their case plans. Motley explained that CCDCFS considered placing the children with C.C. C.C. advised Motley that she could provide for the children's basic needs; however, Motley was not able to verify as much. Motley explained that the agency did not have any information regarding the individuals that C.C. lives with in Vermont. In June 2017, the trial court ordered CCDCFS to complete an out-of-town investigation to determine whether C.C.'s home was appropriate for the children. At the time of the permanent custody hearing, Motley had not received the results of the investigation. However, the Cuyahoga County Prosecutor's Office did receive information regarding C.C. and her house in Vermont.
{¶ 51} Motley testified that the agency filed the motion for permanent custody rather than recommending legal custody to C.C. because "there are still concerns about [C.C.'s] ability to protect the children from further abuse." (Tr. 39.) Based on the information that was provided to Motley when she took over the case, she "had significant concerns that [she] was not comfortable placing the children with [C.C.]" (Tr. 50.)
{¶ 52} C.C. testified that she ensured that there were services and counseling available in Vermont to meet the needs of S.C. and M.C. C.C. addressed Long's testimony regarding their phone conversation on November 20, 2015, and disagreed with the information contained in Long's notes. C.C. explained that there were two incidents involving B.C. that occurred when he was approximately four years old while the family was living in Vermont. One incident *826 involved B.C. using the phrase "suck it," which C.C. believed to be a red flag. The other incident was an action of B.C. These two incidents occurred while C.C. and her daughter had coguardianship of B.C., but they did not take place in her presence. C.C. explained that she had previously obtained guardianship of the children because the parents were unable to meet the children's basic needs. When she obtained guardianship of the children, the issues pertained to the parents' ability to meet the children's basic needs, not any issues involving sexual abuse. C.C. testified that when she and her daughter had coguardianship of the children, B.C. was living with C.C.'s daughter, and appellant and Father were also living with C.C.'s daughter.
{¶ 53} C.C. acknowledged that before the family moved from Vermont to Cleveland, she had two discussions with Father about having sex while the children were in the room. When she was asked if she thought that having sex in a room in which the children were present was a form of sexual abuse, C.C. stated,
Well, that depends. A lot of parents have sex after their children go to sleep if the children are young. So if they're setting their children at the foot of the bed and having sex, yes, I think it's a form of sexual abuse.
If they're having sex with their children in the room while the children are sleeping, I think it's a lack of common sense.
(Tr. 327.) C.C. confirmed that before the family moved to Cleveland, there was an issue in Vermont involving the parents having sex while the children were present in the room. (Tr. 328.)
{¶ 54} C.C. communicated her concerns about appellant and Father having sex while the children were present in the room to Long. She was concerned that the children might have seen or heard things that they should not be exposed to at that age. When these concerns arose, the family was living in a motel.
{¶ 55} The children's GAL described the sexual abuse in this case as being the most severe that he has seen in his 28-year career. He recommended granting permanent custody to CCDCFS rather than granting legal custody to C.C. based on the children's conditions, issues, and need for counseling services. The GAL opined that B.C.'s issues are more severe than M.C.'s or S.C.'s issues, and explained that B.C. is "nowhere near able to be returned to any relatives or anyone other than somebody with a lot of training for him." Regarding M.C., the GAL could not see how M.C. could reunify with her siblings or a relative based on the fact that she is unable to talk about her body parts or anything that took place while she lived with her family. The GAL stated that M.C. needs ongoing treatment and believed that it would be difficult for her to adjust to a new therapist. He testified that M.C. is certainly not ready to be with S.C. at this point, as she continues to have issues regarding sexualized behaviors. Regarding S.C., the GAL explained that her issues are the least severe of the three children. However, he explained, "I have a hard time separating the girls out of states, taking one girl and leave the other girl [in Cuyahoga County]." (Tr. 338.)
{¶ 56} The GAL acknowledged that he did not know whether C.C. was able to provide for the children's basic needs. However, he explained that basic needs was not the "central issue." (Tr. 342.) Rather, he opined that the primary issue was the present condition of the children, the significant issues the children were having as a result of the sexual abuse, and their need for ongoing treatment. Based on the information he received from Long, the GAL questioned C.C.'s ability to protect the children in the future.
*827 {¶ 57} Based on the foregoing analysis, we cannot say that the trial court abused its discretion in determining that permanent custody was in the children's best interest. Although Long and C.C. provided conflicting testimony regarding the family history, alleged sexual abuse that occurred in Vermont before the family moved to Ohio in 2015, and the information discussed during the phone conversation between C.C. and Long in November 2015, the trial court, as the trier of fact, was in the best position to weigh the evidence and make a credibility determination.
When testimony is in dispute, we defer to the trier of fact's credibility determination. [ Fanous v. Ochs , 8th Dist. Cuyahoga No. 98649, 2013-Ohio-1034, 2013 WL 1187402, ¶ 18 ]. Indeed, the trier of fact "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co. v. Cleveland , 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).
Calanni v. Kolodny , 8th Dist. Cuyahoga Nos. 105269 and 105271, 2018-Ohio-1289, 2018 WL 1640036, ¶ 15.
{¶ 58} The record reflects that the trial court considered all relevant statutory factors, and despite the willingness of C.C. to assume legal custody of one or more of the children, clear and convincing evidence supports the trial court's determination that permanent custody is in the children's best interest. Because permanent custody to CCDCFS is in the children's best interest, legal custody to C.C. necessarily is not.
{¶ 59} Finally, to the extent that appellant argues that the trial court should have extended temporary custody in order to (1) further investigate placement with C.C. and the suitability of her home in Vermont or (2) provide family counseling to S.C. and M.C. to prepare them for reunification with one another and placement with C.C., the trial court was statutorily precluded from doing so. R.C. 2151.415(D)(4) provides that "the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered." In this case, CCDCFS filed its complaint on October 22, 2015. On the same day, the children were placed in the agency's emergency predispositional custody. At the time that the permanent custody hearing concluded and the trial court issued its judgment entries in December 2017, more than two years had elapsed. Therefore, even if the trial court had reasonable cause to believe that an extension was in the children's best interest, it could not order an extension of temporary custody.
{¶ 60} For all of the foregoing reasons, appellant's first assignment of error is overruled.
D. Reasonable Efforts
1. CCDCFS's Efforts to Reunify the Family
{¶ 61} In her second assignment of error, appellant argues that CCDCFS failed to make reasonable efforts or give adequate consideration to placing the children with interested relatives C.C. and E.K. as an alternative to permanent custody. In support of her argument, appellant contends that CCDCFS failed to handle the case diligently, failed to adequately investigate placing the children with the interested relatives, and did not investigate the homes of C.C. or E.K. Rather, appellant maintains that "CCDCFS summarily decided, based on inaccurate and incorrect information, that [C.C.] and [E.K.] were *828 not suitable placement options, and [the agency's] erroneous conclusion was relied upon by the [GAL]." Appellant's brief at 36.
{¶ 62} Appellant cites CCDCFS's duties under Ohio Administrative Code ("OAC") Section 5101. OAC 5101:2-42-05(E) provides, in relevant part, that
a children services agency is required to select a substitute care setting that is consistent with the best interests and special needs of the child. Ohio Adm.Code 5101:2-42-05(E). Under the rules, the substitute-care setting must be "the least restrictive, most family-like setting available to meet the child's emotional and physical needs," and must "provide a safe environment for the child." Ohio Adm.Code 5101:2-42-05(E)(1) and (5).
In re J.F. , 8th Dist. Cuyahoga, 2018-Ohio-96, 102 N.E.3d 1264, at ¶ 35. This court has recognized that OAC Section 5101 pertains to CCDCFS's obligations and its determination regarding substitute-care placement, rather than a trial court's permanent custody determination. In re J.F. at ¶ 36.
{¶ 63} As noted above, appellant's challenge to the trial court's judgment granting CCDCFS permanent custody is limited to whether the trial court improperly terminated her parental rights. Appellant does not have standing to assert the rights of C.C. on her behalf. See In re Pittman , 9th Dist. Summit No. 20894, 2002-Ohio-2208, at ¶ 70, citing In re Evens , 9th Dist. Summit No. 19489, 2000 WL 141074, *2-3, 2000 Ohio App. LEXIS 282, *7 (Feb. 2, 2000) (although a parent has standing to challenge the trial court's judgment denying a motion for legal custody to a relative where the judgment led to granting permanent custody to a children's services agency and impacted the parent's rights, the parent is limited to challenging the manner in which the trial court's judgment impacted his or her rights, not the rights of a relative). Accordingly, appellant has no standing to assert that C.C.'s rights were violated because CCDCFS purportedly failed to comply with the relevant sections of the OAC.
{¶ 64} Nevertheless, the record does not support appellant's assertion that CCDCFS failed to adequately consider C.C.'s suitability for placement. Long testified that relative placement is the least restrictive placement option for a child, and that CCDCFS's policy when determining placement is to first look for available relatives. Long acknowledged that C.C. was interested in caring for the children from the very beginning of the agency's involvement with the family.
{¶ 65} Long testified that when she was assigned the case in November 2015, CCDCFS conducted a "formal investigation" of C.C. as a placement option. (Tr. 81.) Long initiated a "home study"[4] investigation when she spoke with C.C. on the phone on November 20, 2015. After this conversation, Long felt that C.C. was not an appropriate candidate for placement. As a result, Long did not move forward with the home study process by ordering an out-of-town or out-of-state investigation.[5]
*829 {¶ 66} Long asserted that she made the decision not to order an out-of-town investigation based on (1) the fact that C.C. did not appear to have protected the children while they resided in Vermont, (2) the extensive history of sexual abuse that had occurred in the family, (3) CCDCFS's concern that C.C. knew about the issues that were occurring with the children, yet failed to intervene or protect the children from further harm, and (4) the issues that occurred while C.C. had guardianship or coguardianship of the children during which the children were in her care. Long further explained that she did not conduct the out-of-town investigation because of C.C.'s history of sexual abuse, the children had been traumatized, and Long did not want to place the children back into an environment in which they had been traumatized in the past or with a family in which there had been multiple incidents involving sexual abuse. Regarding the family's history of sexual abuse, Long learned that C.C.'s ex-husband had sexually abused C.C.'s children and that C.C. and E.K. had been sexually abused when they were growing up. Finally, Long testified that while she was considering placement with interested relatives, she was also learning more about the children and the issues they were having, trying to address the children's sexual abuse issues, and trying to stabilize the children.
{¶ 67} Motley testified that CCDCFS initially tries to reunify children with their biological parents, which was not possible in this case due to appellant's and Father's incarceration. She explained that when reunification with parents is not possible, the agency's next step is to look for appropriate family members to place the children with.
{¶ 68} Motley acknowledged that she did not conduct her own home study or investigation of C.C. Based on Long's investigation of C.C. and the concerns that arose therein, Motley did not order an out-of-town investigation of C.C.'s home in Vermont. She did not order an out-of-town investigation of E.K. Motley explained that when she took over the case from Long in August 2016, the determination had already been made that there were no appropriate relatives to place the children with. As a result, CCDCFS filed the motion for permanent custody.
{¶ 69} Motley testified that CCDCFS did request an out-of-town investigation of C.C.'s home in Vermont pursuant to the trial court's order. However, this investigation had not been completed at the time of the permanent custody hearing.
{¶ 70} The children's GAL acknowledged that both C.C. and E.K. had expressed an interest in caring for the children from the beginning of the custody proceedings. He further acknowledged that ideally, CCDCFS could have done more to investigate C.C. and E.K.
{¶ 71} The GAL did not know whether C.C. could provide for the children's basic needs. After he submitted his GAL report in January 2017, he received and reviewed documents from C.C. He explained that these documents appeared to indicate that C.C. could provide for the children's basic needs. However, he asserted that the documents did not change his recommendation to grant permanent custody to CCDCFS. The GAL emphasized that even if C.C. could provide for the children's basic needs and that she was appropriate for placement, he would still recommend permanent custody based on the children's present condition, severe needs, and need for ongoing treatment.
{¶ 72} Based on the foregoing analysis, we find no merit to appellant's assertion that CCDCFS failed to give adequate consideration to placing the children with interested relatives. Rather, the record *830 reflects that the agency considered the interested relatives for placement, but ultimately determined that placement with these relatives would not be in the children's best interest. Accordingly, appellant's second assignment of error is overruled.
2. Trial Court's Findings
{¶ 73} In her third assignment of error, appellant argues that the trial court's determination that CCDCFS made reasonable efforts to prevent the removal of the children from the home is against the manifest weight of the evidence.
{¶ 74} As an initial matter, we must note that the reasonable efforts finding set forth in R.C. 2151.419 pertains to whether an agency made reasonable efforts to (1) prevent the removal of a child from the child's home , (2) eliminate the continued removal of the child from the child's home , or (3) return the child to the child's home . (Emphasis added.) In re J.H. , 8th Dist. Cuyahoga No. 105073, 2017-Ohio-1564, 2017 WL 1532731, ¶ 12. It does not, as appellant suggests, require the trial court to find that CCDCFS made "reasonable efforts to place the children with interested relatives." Appellant's brief at 35. Furthermore, R.C. 2151.419 is inapplicable in this case because CCDCFS filed its motion for permanent custody pursuant to R.C. 2151.413. See In re C.F. , 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 41 ( R.C. 2151.419 does not apply to motions for permanent custody filed pursuant to R.C. 2151.413, or permanent custody hearings held pursuant to R.C. 2151.414.); In re Baby Boy M. , 8th Dist. Cuyahoga No. 91312, 2008-Ohio-5271, 2008 WL 4519120, ¶ 41 (trial court did not need to make a reasonable efforts determination because it was ruling on a motion for permanent custody.).
{¶ 75} Although the trial court was not required to do so, the record reflects that the trial court did, in fact, make a reasonable efforts finding in its judgment entries granting CCDCFS permanent custody of the children. The trial court's December 19, 2017 judgment entries provide, in relevant part,
Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially cause the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
* * *
The Court further finds that reasonable efforts were made to prevent the removal of the child from the parent's, home or to return the child to the home, and to finalize the permanency plan, to wit: reunification. Relevant services provided to the family were: Drug and alcohol assessment, complete any treatment or after care, comply with urine screens, basic needs, housing, participate in psychological evaluation through Juvenile Court, and follow all treatment recommendations therefrom. The reason the services were not successful: Mother and Father have failed to complete the case [plan] services and are currently incarcerated for a period of 10 years.
{¶ 76} The trial court's reasonable efforts determination is supported by clear and convincing evidence in the record. Motley testified that CCDCFS established a case plan for appellant and Father with the ultimate goal of reunification. She explained that the objectives of appellant's case plan were safe and appropriate housing, substance abuse assessment, and psychological *831 evaluation. The objectives of Father's case plan were housing, substance abuse assessment, and psychological evaluation. Neither appellant nor Father were able to complete the objectives or requirements of their case plans due to their incarceration.
{¶ 77} Based on the foregoing analysis, appellant's third assignment of error is overruled.
III. Conclusion
{¶ 78} After thoroughly reviewing the record, we affirm the trial court's judgment granting permanent custody of the children to CCDCFS. The trial court considered all relevant statutory factors, and despite C.C.'s willingness and desire to assume legal custody of the children, clear and convincing evidence supports the trial court's determination that permanent custody is in the children's best interest. Because permanent custody to CCDCFS is in the children's best interests, legal custody to C.C. necessarily is not.
{¶ 79} Judgment affirmed.
MARY J. BOYLE, P.J., and PATRICIA ANN BLACKMON, J., CONCUR

CR-16-604251-A pertained to appellant, and CR-16-604251-B pertained to Father.

The record reflects that E.K. and C.C. are sisters. (Tr. 245.)

Long and C.C. disputed the information discussed during this conversation.

A "home study" is CCDCFS's established policy for investigating relatives that are interested in caring for a child. (Tr. 157-158.)

If an interested relative lives out of state, CCDCFS can conduct an out-of-town or out-of-state investigation. In such cases, CCDCFS contacts the children and family services agency in the state where the interested relative lives, provides the agency with the interested relative's contact information, and the agency assigns a case worker to complete an investigative home study of the relative's home. (Tr. 157-158.)