[Cite as *In re T.W.*, 2021-Ohio-2031.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE T.W., ET AL.

Minor Children

[Appeal by T.S., Mother]

:
:
:
:
:
:

No. 109967

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 17, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-17907161, AD-17907162, AD-17907163, and AD-17907164

---

***Appearances:***

Scott J. Friedman, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young and Cheryl Rice, Assistant Prosecuting Attorneys, *for appellee.*

LISA B. FORBES, J.:

{¶ 1} T.S. ("Mother") appeals the juvenile court's decision terminating her parental rights and awarding permanent custody of her four minor children, T.W., T.S., Ta.S., and Te.S. (collectively "the Children") to the Cuyahoga County Division of Child and Family Services ("CCDCFS"). After reviewing the law and pertinent facts of the case, we affirm.

## I. Procedural History

{¶ 2} CCDCFS has been involved with the Children since December 2016, after an incident where the youngest child suffered injuries and burns under suspicious circumstances. As a result, the Children were placed under the temporary custody of the agency. Approximately ten months later, the Children were reunified with Mother and CCDCFS's role was modified from temporary custody to protective supervision. On August 20, 2018, CCDCFS filed a motion to modify its role from protective supervision to temporary custody of the Children. CCDCFS argued that granting the agency temporary custody was in the Children's best interest because Mother stopped engaging in case plan services, failed to engage in mental-health services, failed to ensure T.S. participated in recommended counseling, and lacked appropriate stable housing. Temporary custody was returned to CCDCFS on August 28, 2018.

{¶ 3} On June 21, 2019, CCDCFS filed a motion seeking permanent custody of the Children. The court held a hearing on September 3, 2020, and on September 8, 2020, the court granted the motion through four separate judgment entries, one for each child. The trial court awarded permanent custody to CCDCFS and terminated Mother's parental rights. In each judgment entry, the trial court found that clear and convincing evidence had been presented demonstrating, under R.C. 2151.414(B)(1)(a), that each child cannot and should not be placed with Mother within a reasonable time. In reaching those conclusions, the trial court made specific findings in relation to factors set forth in R.C. 2151.414(E). In addition, the

trial court found that clear and convincing evidence had been presented establishing that granting CCDCFS's motion for permanent custody was in each of the Children's best interest under R.C. 2151.414(D). It is from these entries that Mother appeals.

## II. Standard of Review — Permanent Custody

{¶ 4} "This reviewing court will not overturn a permanent custody order unless the trial court has acted in a manner that is arbitrary, unreasonable or capricious." *In re Satterwhite,* 8th Dist. Cuyahoga No. 77071, 2001-Ohio-4137, 2001 Ohio App. Lexis 3722, 6 (Aug. 23, 2001), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). In terminating a parent's parental rights to their child, the trial court's decision must be supported by clear and convincing evidence. R.C. 2151.414; *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 19 (8th Dist.); *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 48.

{¶ 5} "Courts apply a two-pronged test when ruling on permanent custody motions." *In re De.D.,* 8th Dist. Cuyahoga No. 108760, 2020-Ohio-906, ¶ 16. To grant the motion, courts first must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply, or that (B)(2) applies. *Id.* "Second, courts must determine that terminating parental rights and granting permanent custody to the agency is in the best interest of the child or children using the factors in R.C. 2151.414(D)." *Id.*

## III. The September 3, 2020 Hearing

{¶ 6} At the September 3, 2020 disposition hearing, CCDCFS presented three witnesses: Christopher Walters ("Walters"), Willisa Sharp — also referred to

as Willisa Haynes — ("Sharp"), and Angela Quinn ("Quinn"). Mother presented one witness, her sister D.E. The guardian ad litem for the Children, Helen Rhynard, (the "GAL") submitted a written report prior to the hearing and also provided oral testimony. In addition, 28 exhibits were entered into evidence without objection. The following testimony and information were presented at the hearing.

### A. Christopher Walters's Testimony

{¶ 7} Walters testified that he is a social worker in the extended services division at CCDCFS. He began working with the Children as their case worker in approximately January 2019, after the Children had already been in CCDCFS's custody.

{¶ 8} According to Walters, Mother's case plan required her to obtain housing, take parenting classes, and get mental-health treatment. In addition, at one point there was a concern that mother may need substance-abuse treatment if that was at the heart of her behavioral issues.

{¶ 9} Walters testified that mother had obtained appropriate housing prior to the hearing. There were some beds, and some blow up mattresses for the Children to sleep on. However, Mother told Walters on several occasions that "she doesn't like staying in that part of public housing. She does not feel safe." As a result, "[s]he's not there quite often." Rather than meeting with Mother at her residence, she asked Walters to meet her at other locations, such as her aunt's house or other family member's houses.

{¶ 10} Walters explained that "[Mother] was adamant that she did not want to participate in any services." Walters described Mother's "unwillingness to participate in the goals and objectives of the case plan, to interact with [him] to try to assist her, and just her overall disdain for the system, for the Agency, for Juvenile Court, that this had been going on for so long that she was tired."

{¶ 11} Walters referred Mother to several organizations for mental-health treatment and counseling including Circle Counseling, Centers for Children and Family, Ooma Dot, and the Court Clinic. Walters testified that when he would tell Mother she needed to re-engage with mental-health services, Mother told him she did not need the services because there was "nothing wrong with [her]." Mother "refused" that service. Walters was aware that Mother did not have insurance, which is why he referred her to an agency, Circle Counseling, that provides free counseling services.

{¶ 12} Walters testified that Mother was referred to parenting services at Catholic Charities. Mother did not respond, she did not participate. Walters discussed with Mother the need for her to do so as part of her case plan objective, and made it clear to her why he was asking her to participate in parenting services. At the time of the second removal, the permanency plan was for reunification, and the case plan was designed to promote that goal. Walters explained to Mother that CCDCFS was asking her to do certain things to get back to reunification with the Children. According to Walters, Mother felt that "[s]he didn't need to do [those things]. [She'd] done them already. There's nothing wrong with [her]."

{¶ 13} Walters supervised Mother's visitation with the Children before Sharp became involved in the case and again after Sharp ceased supervision. Though Mother made good efforts to engage with the Children and Walters recognized that there were good visits, Walters described other visits between Mother and the Children as "chaotic" and "dysfunctional." On several occasions, Mother would have outbursts while visiting the Children. Mother's disdain for the system would manifest during visitation. Walters explained, "her behaviors would become angry verbally and physically aggressive, and then afterwards she would say to me, it's not you. I'm mad at the system." Mother was never directly physical with Walters but "she was physically threatening. She'd kick the trash can, would hit or bang on the wall" and at times would scream or yell. Walters observed that the Children's behaviors would change because they "stemmed from [Mother's]."

{¶ 14} Walters testified about the Children's behavioral issues. For example, at one scheduled visitation that Mother did not attend, T.S. hit Walters and threatened to run away. Another child, T.W., was diagnosed with depression and PTSD. She is receiving counseling services, though she refuses to participate. Walters testified that she is "very parentified. She's used to, as she has expressed it, being the mother sometimes of her siblings due to mom's mental health concerns." Ta.S. has also been diagnosed with PTSD and depression. T.S. has some severe anger issues and mental-health concerns. He is currently in residential treatment. Mother has participated in some services with T.S. Te.S., the youngest, has PTSD and depression. He is verbally and physically aggressive. All four of the Children

have been prescribed medications. Walters testified that Mother has not demonstrated the skills necessary to manage the Children's behavior and mental-health concerns.

{¶ 15} Walters stated that due to COVID-19, CCDCFS could not schedule in-person visits but he and CCDCFS instructed Mother to communicate with the Children virtually or by phone. Mother did communicate with T.W. and Ta.S. regularly, and at times with T.S. However, she refused to engage with Te.S. His caregiver would try to get Mother involved by encouraging her to call, visit, or participate in his sporting activities, but Mother refused.

{¶ 16} When Walters spoke with the Children, they expressed that they would like to go home with Mother, "because my mother didn't do anything."

{¶ 17} Walters estimated that his last face-to-face contact with Mother was "before COVID-19." In roughly May 2020, Mother refused to speak with Walters. She conveyed that message in a text message. Since then, Walters made efforts to reach out to Mother to inform her of meetings and of court dates. He did so by calling her.

{¶ 18} When asked whether any relatives were potentially available to place the Children with, Walters explained that the agency did investigate and had looked at T.W.'s father, D.E., and Ta.S.'s paternal grandmother for possible placement. However, at the time of the hearing, none of the Children's relatives were deemed appropriate for placement of the Children.

## B. Willisa Sharp's Testimony

{¶ 19} Sharp testified that she works as a visitation specialist for Catholic Charities, and supervised Mother's visitation with the Children from July 25, 2019, until December 5, 2019. Sharp ceased supervising Mother's visitation after Mother missed too many scheduled visitations. The decision to terminate services was in accordance with Catholic Charities' policy. Sharp explained that during the time she supervised visitation "a lot of [Mother's] visits were negative. [She] would cope with her anger by talking about the case with her kids." There were occasions where Mother would talk negatively about the Children's fathers, which would cause visitation to end negatively. When she observed this, Sharp tried to redirect Mother and encouraged her to be more positive. Mother responded, "that she can talk to her kids about whatever she wants to." According to Sharp, these negative visits occurred most of the time; that there were only a few positive visits.

## C. Angela Quinn's Testimony

{¶ 20} Quinn testified that she is a program manager for Cleveland Metropolitan Housing Authority's Central Collaborative where Mother had scheduled visitation with the Children from December 2018, until March 2020. Quinn and her staff did not supervise Mother's visitation but stated that she could hear from her office when there was commotion going on in the visitation room. She stated that if Mother raised her voice, either she or her staff would go in the visitation room to see what was going on and to see if they could redirect Mother. Quinn stated that the visits were "okay" a majority of the time. However, "every so

often" Mother would have "episodes" such that she needed to be redirected about the tone of her voice and behavior.

{¶ 21} On one occasion Quinn recalled, Mother had an "episode" involving Ta.S.'s father, M.S. Both M.S. and Mother were present for the visitation. A verbal altercation erupted between the two, with Mother accusing M.S. of attempting to have his girlfriend beat-up Mother. Mother and M.S. had to be separated and visitation ended early. On another occasion, Mother had an "episode" about the bathroom. Quinn described the situation as Mother taking one child to the bathroom and that being a "trigger" for her because according to Mother, "going to the bathroom was how the Children first were placed into custody." Mother became loud and visibly upset. Quinn explained that when Mother had these episodes, she and her staff would try to talk to her, redirect her, or let her sit in a sperate room to calm down. She explained to Mother that the Children are impressionable and "take on the behavior of [their] parent." Overall, she observed that the Children looked forward to visits with Mother, but that "sometimes the mental health behavior [overshadowed] the visitation."

**D. D.E.'s Testimony**

{¶ 22} D.E., the Children's aunt, testified that the Children were placed in her home for a few months while in CCDCFS's custody. The Children were removed after an altercation in the home between D.E. and her boyfriend. In D.E.'s opinion, Mother is a "great mom" and has "always been a great mom since she was 15 years old." D.E. stated that she was not concerned with Mother's mental health

because "when she's around me, she's perfectly fine." According to D.E., Mother

had secured housing; however, Mother often stayed with her for reasons unknown

to D.E. D.E. testified that the Children told her they want to be with Mother.

### E.  The GAL's Testimony

{¶ 23} The GAL filed a written report and reiterated the contents of that

report on the record at the hearing. She started her testimony by stating, "I would

recommend the granting of the permanent custody motion filed by the Agency." The

GAL explained:

> This case needs to come to an end. It's been ongoing for many years. I believe I met this family in 2016 originally and since that time we've been Court-involved. There's been two removals, multiple placements. It's just been a very long haul for this family.
>
> * * *
>
> As far as mom, mom very much loves her children. * * *
>
> Mom's interaction with her kids when I saw her was good, but I saw her interact with her children prior to a lot of the manifestation of the mental health issues and the mental health issues came out in the last I would say two years of this case.

{¶ 24} The GAL observed that Mother "has always struggled with housing."

Throughout her time being assigned to this case, the GAL was never able to actually

visit where Mother was living. She noted that when Mother did secure housing, she

often stayed elsewhere.

{¶ 25} About Mother's mental health, the GAL explained:

> Mom's mental health * * * became an issue, a prominent issue in the later half of this case.
>
> * * *

I believe that mom was experiencing some kind of mental health episode.

{¶ 26} On one occasion, the GAL recalled talking to Mother about the case when Mother "broke out into a conversation about an Arab hitting her on the head and she seemed to think that there was somebody else there and there was nobody present. It was just [Mother] and I." She described several other concerning situations, including Mother calling screaming about Donald Trump; and Mother believing she worked for Donald Trump, the CIA, and a rapper.

{¶ 27} When the GAL was testifying about Mother's Donald Trump comments, Mother interrupted the court proceedings and was admonished by the court to remain quiet. She also had outbursts during Walters's testimony. During CCDCFS's closing arguments, the court summoned a deputy because Mother would not return to her seat and was exclaiming, "I've been trying for five years. Of course I want to die."

{¶ 28} The GAL ultimately stated "[a]t this point I don't see how any of these parents could be reunified with these children and then address the children's needs because they haven't addressed their own needs." With regard to behavioral issues with the Children, the GAL's report and testimony explained that T.S. has been expelled from school, been moved between several different placements, been placed in residential care, and various services have been put in place to address his needs. T.S. was removed from his foster home placement and placed into residential care after he "pulled out a knife and threatened to kill his caregiver." He has been

diagnosed with PTSD and ODD. T.W. "has a history of PTSD and defiant behavior." In 2019, she "AWOL'd" from her foster home. T.W. has refused to participate in counseling. Ta.S. has also struggled. She has been diagnosed with PTSD and ADHD. Ta.S. has also demonstrated behaviors of self-harm and made threats to teachers, bus drivers, and her foster mother. However, being placed in a foster home with her sister, T.W., has helped with these behaviors. Te.S. also demonstrated some behavioral issues and has been diagnosed with PTSD. T.S., Ta.S., and Te.S. all take medications to address these issues.

{¶ 29} Finally, the GAL testified that the Children had recently expressed that they wished to return to Mother's care but have since "flip flopped" and now are indifferent to whether or not they return to Mother's care.

## IV. Law and Analysis

### A. First Assignment of Error

{¶ 30} In Mother's first assignment of error, she argues that the trial court's decision terminating her parental rights is against the manifest weight of the evidence. Upon review of all of the testimony and evidence presented in the case at bar, we find that the juvenile court's decision terminating Mother's parental rights

was not arbitrary, unreasonable, or capricious and was supported by clear and convincing evidence.

### 1. R.C. 2151.414(B)(1) Factors

{¶ 31} Under the two-prong analysis, the court first decides whether any of the conditions under R.C. 2151.414(B)(1) or (2) apply. If any of the conditions identified in subsection (1)(a)-(e) apply, that provision has been satisfied.

{¶ 32} Here, the juvenile court made findings for each child under subsection (B)(1)(a), finding that each of the Children "has not been in the temporary custody of [CCDCFS] for twelve or more months of a consecutive twenty-two-month period * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." Here, there is no dispute that CCDCFS filed its motion for permanent custody less than a year after the Children had been in CCDCFS custody. CCDCFS filed its motion on June 21, 2019. At that time, each child had been in CCDCFS's custody since August 28, 2018, not quite ten months.

{¶ 33} To assess whether the Children "cannot be placed with either parent within a reasonable time or should not be placed with either parent," which is the second component of subsection (B)(1)(a), the juvenile court made findings guided by division (E), which delineates factors a court may consider in making that determination.

{¶ 34} Under subsection (E)(1), for each of the Children, the court found that Mother "has failed continuously and repeatedly to substantially remedy the conditions causing the [Children] to be placed outside the [Children's] home."

{¶ 35} Under subsection (E)(2), for each of the Children, the court found that "Mother has a chronic emotional illness that is so severe that it makes her unable to provide an adequate permanent home for the [Children] at the present time and, as anticipated, within one year after the Court holds a hearing in this matter."

{¶ 36} Under subsection (E)(3), for each of the Children, the court found that "Mother has neglected the [Children] between the date of the original complaint was filed and the date of the filing of this motion by [her] failure to support the [Children]."

{¶ 37} Under subsections (E)(4) and (14), for each of the Children, the court found that Mother "has demonstrated a lack of commitment towards the [Children] by failing to regularly support and by her other actions, has shown an unwillingness to provide an adequate permanent home for the [Children]." Further, the court found that Mother was unwilling to "successfully complete a case plan so she can provide care for the [Children]."

{¶ 38} Each of these findings is supported by clear and convincing evidence in the record. The Children were reunified with Mother after a previous removal and were subsequently removed again because Mother was unable to provide them with appropriate care. A case plan was established to address her parenting, mental

health, possible substance abuse, and housing.  The trial court heard testimony that Mother failed or refused to engage in case plan services and had a "disdain for the system" when her case worker tried to engage with her.  Further, Mother refused mental-health services repeatedly despite numerous referrals.  The court also heard testimony about various behaviors and outbursts by Mother.  While testimony was given that Mother has secured housing, the court also heard testimony that Mother refuses to stay there and does not feel safe there.

### B. R.C. 2151.414(D)(2) Best-Interest Factors

{¶ 39} Having found that clear and convincing evidence had been presented on the 2151.414(B)(1)(a) factors, the juvenile court turned to assessing whether an award of permanent custody to the agency would be in the best interest of the Children.  The juvenile court made findings consistent with granting permanent custody under R.C. 2151.414(D)(2), which states if all four of its subsections apply, "permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency."

{¶ 40} Subsection (a) looks to whether one or more of the factors in division (E) of R.C. 2151.414 exist "and that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent."  As analyzed above, the juvenile court found that evidence had been presented supporting five of the division (E) factors.

{¶ 41} Subsection (b) directed the juvenile court to determine if the Children had been in agency custody for two years or longer and, therefore, no longer qualified for temporary custody pursuant to R.C. 2151.415(D). Revised Code Section 2151.415(D)(4) states:

> the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section.

Here, the juvenile court found that the Children had been in agency custody for over two years at the time it entered judgment. The Children had been in CCDCFS's temporary custody since August 28, 2018, the hearing was held on September 3, 2020, and judgment was entered on September 8, 2020.

{¶ 42} Subsection (c) directed the court to determine if the child did not meet the requirements for a planned permanent living arrangement pursuant to R.C. 2151.353(A)(5). If they do not meet the requirements, then this element is satisfied. Here, CCDCFS did not request for the Children to be placed in a planned permanent living arrangement and there is no evidence that any of the requirements listed in the statute were met.

{¶ 43} Finally, subsection (d) directed the court to determine whether, "prior to the dispositional hearing, no relative or other interested person has filed or been identified in a motion for legal custody of the child." The record does not indicate any such motion was filed. Further, testimony at the hearing supports the court's finding. The Children were placed with their maternal aunt, D.E., at one point but

were eventually removed after an altercation in her home. Additionally, Walters testified that CCDCFS had looked into several family members, but no one was deemed suitable for placement.

{¶ 44} Upon review, we find that the testimony presented at the disposition hearing contained clear and convincing evidence to support the juvenile court's findings under R.C. 2151.414. Determining under R.C. 2151.414(B)(1)(a) that the Children could not or should not be placed with Mother is supported by testimony from Walters, Sharp, Quinn, D.E. and the GAL, and the court's findings under R.C. 2151.414(E)(1), (2), (3), (4), and (14). Determining under R.C. 2151.414(D)(2) that permanent custody to CCDCFS is in the Children's best interest is supported by the testimony presented by Walters, D.E., and the GAL, and the court's findings that Mother has neglected the Children and continuously failed to remedy the issues that caused the Children to be placed outside of the home by, among other things, failing to provide adequate permanent housing.

{¶ 45} The juvenile court's termination of Mother's parental rights and award of permanent custody of the Children to CCDCFS is supported by clear and convincing evidence in the record. Mother's first assignment of error is overruled.

## V. Second Assignment of Error

{¶ 46} Mother's second assignment of error argues that the court erred in finding that each child has been "in the agency's custody for two years and no longer qualifies for temporary custody * * *." Mother concedes that under "normal circumstances" the trial court's conclusion is correct but argues that pursuant to the

Supreme Court of Ohio's tolling order, she should have been given an extra four months to comply with the agency's case plan. We disagree.

{¶ 47} The Supreme Court of Ohio's tolling order only tolls "time requirements imposed by the rules of the Court * * *." *In re Tolling of Time Requirements Imposed by Rules Promulgated by the Supreme Court & Use of Technology*, 158 Ohio St.3d 1447, 1448, 2020-Ohio-1166, 141 N.E.3d 974. Rules of the court include: the Ohio Code of Judicial Conduct, the Ohio Rules of Appellate Procedure, the Ohio Rules of Civil Procedure, the Ohio Rules of Criminal Procedure, the Ohio Rules of Evidence, the Ohio Rules of Juvenile Procedure, the Ohio Rules of Professional Conduct, etc. The tolling order does not affect time requirements imposed by statute. Here, R.C. 2151.353(G) dictates that an order of temporary custody shall not be extended by the court after two years. The two-year time limit is not a rule imposed by the Supreme Court of Ohio. Thus, it is unaffected by the tolling order.

{¶ 48} Therefore, Mother's second assignment of error is without merit and is overruled.

{¶ 49} Having overruled both assignments of error, the judgment of the trial court is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EMANUELLA D. GROVES, J., CONCUR