[Cite as *In re A.T.*, 2021-Ohio-4306.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE A.T.

A Minor Child

[Appeal by Ay.T., Mother]

:
:
:
:
:
:

No. 110689

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** December 9, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-19-902330

---

***Appearances:***

Gregory T. Stralka, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

---

FRANK D. CELEBREZZE, JR., J.:

{¶ 1} Appellant, Ay.T., brings this appeal challenging the juvenile court's judgment granting permanent custody of her minor child, A.T., to the Cuyahoga County Division of Children and Family Services (hereinafter "CCDCFS" or "agency"). Appellant argues that the juvenile court's judgment granting permanent custody to CCDCFS was against the manifest weight of the evidence and that

CCDCFS failed to present sufficient evidence to meet its burden of proof regarding the factors set forth in R.C. 2151.414(E). After a thorough review of the record and law, this court reverses the juvenile court's judgment and remands the matter for further proceedings consistent with this opinion.

## I. Factual and Procedural History

{¶ 2} The instant matter arose from the juvenile court's custody determination regarding minor child A.T., born in December 2018. Appellant is A.T.'s mother (hereinafter "Mother"). A.T.'s father is N.H. (hereinafter "Father").[1] Father is not a party to this appeal. As explained in further detail below, A.T.'s brother, J.H., born in November 2020, is not at issue in this appeal.[2]

{¶ 3} CCDCFS became involved with Mother's family in February 2019 after receiving a referral regarding Mother's decision-making abilities and her ability to care for A.T. At the time, Mother was 17 years old and A.T. was two months old. After receiving the referral, the agency conducted an investigation.

{¶ 4} On February 27, 2019, CCDCFS filed a complaint alleging that A.T. was dependent and requesting temporary custody of the child. In its complaint, the agency cited concerns regarding Mother's ability to provide appropriate care for the child and Mother's issues with anger and violence.

---

[1] Although the original complaint alleged that Father failed to establish paternity, and also referenced a John Doe as an alleged father, this language was removed from the agency's amended complaint filed in May 2019.
[2] A.T. and J.H. will be referred to collectively as "children."

**{¶ 5}** Along with its complaint, the agency filed a motion for predispositional temporary custody of A.T. On February 28, 2019, the juvenile court granted predispositional temporary custody of A.T. to CCDCFS.

**{¶ 6}** A case plan was developed for Mother and filed with the juvenile court in March 2020. Mother's case plan included objectives for "parenting, anger management, substance use, treatment, and housing." (Tr. 19.) The case plan also cited concerns regarding domestic violence between Mother and Father and Mother's lack of stable income.

**{¶ 7}** The juvenile court held an adjudicatory hearing on the agency's complaint in June 2019. Mother entered an admission to the allegations in an amended complaint, and the juvenile court adjudicated A.T. to be dependent. The juvenile court granted temporary custody of the child to CCDCFS. On February 28, 2020, the juvenile court ordered an extension of temporary custody.

**{¶ 8}** On August 7, 2020, CCDCFS filed a motion to modify temporary custody to permanent custody. The juvenile court held a hearing on the agency's permanent custody motion on June 7, 2021.

**{¶ 9}** The following parties testified at the permanent custody hearing: (1) Shakeya McKether, CCDCFS supervisor who worked on the family's case between February 2020 and May 2021, (2) Angela McAnerney, CCDCFS extended services worker who was assigned to the case in May 2021, and (3) Christine Noy, the children's foster mother. The testimony of these witnesses will be set forth in detail below.

{¶ 10} The children's guardian ad litem ("GAL") submitted a written report and recommendation to the juvenile court. During the permanent custody hearing, the GAL opined that permanent custody was in the children's best interest. Accordingly, the GAL recommended granting permanent custody to CCDCFS.

{¶ 11} On June 17, 2021, the juvenile court issued a judgment entry terminating Mother's parental rights and granting permanent custody of A.T. to CCDCFS. It is from this judgment that Mother filed the instant appeal on July 23, 2021. Mother assigns two errors for review:

> I. The findings by the [juvenile] court granting permanent custody were against the manifest weight of the evidence.

> II. [CCDCFS] failed to present sufficient evidence to establish a basis upon which permanent custody could be granted.

## II. Law and Analysis

### A. Scope of Appeal

{¶ 12} As an initial matter, we note that the scope of this appeal is limited to the juvenile court's June 17, 2021 judgment in Cuyahoga J.C. No. AD-19-902330 granting permanent custody of A.T. to CCDCFS.

{¶ 13} Mother initially filed an appeal in the juvenile court pro se on July 15, 2021. In her notice of appeal, Mother only appealed from the juvenile court's custody decision pertaining to A.T.

{¶ 14} On July 12, 2021, the juvenile court appointed counsel to represent Mother for appellate purposes. Mother's counsel filed a notice of appeal in the juvenile court on July 20, 2021. Counsel's notice of appeal also only appealed from

the juvenile court's custody decision pertaining to A.T. Mother's counsel's amended notice of appeal, filed in this court on August 2, 2021, only appealed from the juvenile court's June 17, 2021 judgment pertaining to A.T. in Cuyahoga J.C. No. AD-19-902330.

{¶ 15} During oral argument, Mother's counsel requested that the instant appeal pertaining to A.T. be consolidated with the appeal pertaining to J.H. The record reflects, however, that neither Mother nor her counsel filed a notice of appeal in the juvenile court appealing the juvenile court's June 17, 2021 judgment in Cuyahoga J.C. No. AD-21-902189 granting temporary custody of J.H. to CCDCFS. Mother's counsel's amended notice of appeal in the matter presently before this court did not appeal from Cuyahoga J.C. No. AD-21-902189, nor did counsel attach the juvenile court's judgment entry granting temporary custody of J.H. to the agency.

{¶ 16} Mother could have filed a combined notice of appeal by including both case numbers in her notice of appeal. *See* App.R. 3(D). Mother failed to do so. Mother's failure to include J.H.'s case number in her notice of appeal is a jurisdictional defect that cannot be cured at this point. *See In re A.R.*, 8th Dist. Cuyahoga No. 109482, 2020-Ohio-5005, ¶ 16, citing *In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, 900 N.E.2d 607 ("[i]t is a basic principle that the failure to file the requisite notice of appeal within the 30-day period [set forth in App.R. 4(A)(1)] deprives the court of jurisdiction to consider an appeal in a civil matter.").

**{¶ 17}** For all of the foregoing reasons, the scope of this appeal is limited to the juvenile court's June 17, 2021 judgment in Cuyahoga J.C. No. AD-19-902330 granting permanent custody of A.T. to CCDCFS.

## B. Permanent Custody

**{¶ 18}** Mother's assignments of error both challenge the juvenile court's judgment granting permanent custody of A.T. to CCDCFS. Mother argues in her first assignment of error that the juvenile court's decision to award permanent custody of A.T. to CCDCFS was against the manifest weight of the evidence. Mother argues in her second assignment of error that CCDCFS failed to present sufficient evidence to support a finding under R.C. 2151.414(E)(1) that Mother failed to remedy the conditions that led to A.T.'s removal from the home.

**{¶ 19}** Mother's assignments of error are interrelated. Accordingly, we will address them together.

**{¶ 20}** After thoroughly reviewing the record, and for the reasons set forth below, we find that the juvenile court abused its discretion in terminating Mother's parental rights and determining that permanent custody was in A.T.'s best interest. We cannot say that the record contains clear and convincing evidence that it is in A.T.'s best interest to be placed in the permanent custody of CCDCFS.

## 1. Standard of Review

**{¶ 21}** "Parents have a constitutionally protected interest in 'the care, custody, and management of their child[ren].'" *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 15, citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102

S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, that interest is "'always subject to the ultimate welfare of the child.'" *Id.*, quoting *In re B.L.*, 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, ¶ 7.

**{¶ 22}** A juvenile court's termination of parental rights and award of permanent custody to an agency shall not be reversed unless the judgment is not supported by clear and convincing evidence. *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 48. "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.*, 8th Dist. Cuyahoga No. 99931, 2014-Ohio-2051, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

**{¶ 23}** R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong of this statute authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more

months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e). *Id.* "Only one of the factors must be present for the first prong of the permanent custody analysis to be satisfied." *Id.*, citing *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 28.

{¶ 24} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D). *Id.*, citing *In re L.W.*

### 2. R.C. 2151.414(B) Factors

{¶ 25} In the instant matter, the juvenile court determined that the condition set forth in R.C. 2151.414(B)(1)(d) applied. The juvenile court's June 17, 2021 judgment entry provides, in relevant part, "[t]he Court finds by clear and convincing evidence that pursuant to [R.C. 2151.414(B)(1)(d), A.T.] has been in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two month period."

{¶ 26} The juvenile court's finding under R.C. 2151.414(B)(1)(d) is clearly and convincingly supported by the record. CCDCFS Social Worker McKether testified that at the time of the permanent custody hearing, A.T. had been in the agency's custody for more than two years. (Tr. 41.) The record reflects that A.T. was

placed in the predispositional temporary custody of CCDCFS on February 28, 2019. The juvenile court granted temporary custody of A.T. to CCDCFS in June 2019. The children's foster mother testified that A.T. began residing with the foster family on February 27, 2019.

{¶ 27} As noted above, only one of the R.C. 2151.414(B)(1) factors must be present in order to satisfy the first prong of the permanent custody analysis. *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, at ¶ 20, citing *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, at ¶ 28. Because the juvenile court's finding under R.C. 2151.414(B)(1)(d) is clearly and convincingly supported by the record, the first prong of the permanent custody analysis is satisfied in this case.

### 3. Best Interest of the Child

{¶ 28} If the juvenile court determines that one of the factors listed in R.C. 2151.414(B)(1) applies, then the court must determine, by clear and convincing evidence, whether permanent custody is in the best interest of the child. *In re I.S.*, 8th Dist. Cuyahoga No. 107472, 2019-Ohio-638, ¶ 21, citing *In re E.C.*, 8th Dist. Cuyahoga No. 103968, 2016-Ohio-4870, ¶ 29.

{¶ 29} This court reviews a juvenile court's determination of a child's best interest under R.C. 2151.414(D) for an abuse of discretion. *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 55 (8th Dist.), citing *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47. In this regard, "'[a] trial court's failure to base its decision on a consideration of the best interests of the child constitutes an abuse of

discretion.'" *In re J.F.*, quoting *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 60.

{¶ 30} In the instant matter, the juvenile court made findings consistent with granting permanent custody under both R.C. 2151.414(D)(1) and (D)(2).

{¶ 31} First, in determining the best interest of a child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates that the juvenile court consider all relevant factors, including the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 32} "The juvenile court has considerable discretion in weighing these factors." *In re K.P.*, 8th Dist. Cuyahoga No. 107577, 2019-Ohio-181, ¶ 36, citing *In re J.H.*, 8th Dist. Cuyahoga No. 105078, 2017-Ohio-7070, ¶ 53. Although the juvenile court is required to consider each factor listed in R.C. 2151.414(D)(1), no one factor is to be given greater weight than the others. *In re T.H.*, 8th Dist.

Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Only one of the factors set forth in R.C. 2151.414(D)(1) needs to be resolved in favor of permanent custody. *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17. "A trial court's failure to base its decision on a consideration of the best interests of the child constitutes an abuse of discretion." *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 60, citing *In re T.W.*, 8th Dist. Cuyahoga No. 85845, 2005-Ohio-5446, ¶ 27, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 574 N.E.2d 1055 (1991).

{¶ 33} In considering the R.C. 2151.414(D)(1)(a)-(e) factors, the juvenile court found that permanent custody was in the best interest of A.T. The juvenile court's June 17, 2021 judgment entry granting permanent custody to CCDCFS provides, in relevant part,

> With respect to the best interest of the child, the Court has considered the following factors under [R.C.] 2151.414(D)(1):
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster caregivers and out-of-home providers and any other person who may significantly affect the child.
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child.
>
> (c) The custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period.
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

(e) Whether any factors in divisions (E)(7) to (11) of this section apply in relation to the parents and the child.

*After considering the factors in [R.C.] 2151.414(D)(1)(a)-(e), the Court finds that permanent custody is in the best interest of the child.*

(Emphasis sic.)

{¶ 34} The juvenile court did not explain its evaluation of the R.C. 2151.414(D)(1) factors or specifically indicate which factor or factors based upon which it concluded that an award of permanent custody was in the child's best interest. Rather, the juvenile court's judgment entry simply tracked the language of R.C. 2151.414(D)(1). *See In re M.S.*, 2015-Ohio-1847, 34 N.E.3d 420, ¶ 53 (8th Dist.).

{¶ 35} Second, the juvenile court also found that permanent custody was in the child's best interest pursuant to R.C. 2151.414(D)(2). R.C. 2151.414(D)(2) provides that if all of the following apply, permanent custody is in the best interest of the child, and the juvenile court shall commit the child to the permanent custody of CCDCFS:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

**{¶ 36}** In the instant matter, the juvenile court found that all of the sections under R.C. 2151.414(D)(2) applied. The juvenile court's June 17, 2021 judgment entry granting permanent custody to CCDCFS provides, in relevant part,

Additionally, with respect to the best interest of the child, the Court finds that pursuant to [R.C.] 2151.414(D)(2) that all of the following apply:

(a) The Court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in the agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Ohio Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of Section 2151.353 of the Ohio Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal Custody.

As all of these sections apply, permanent custody is in the best interest of the child, and this Court as required by this statute, shall commit the child to the permanent custody of CCDCFS.

**{¶ 37}** The juvenile court did not specify which factor or factors under R.C. 2151.414(E) existed in making the finding under R.C. 2151.414(D)(2)(a). However, the juvenile court's June 17, 2021 judgment entry goes on to state, in relevant part,

While the Court does not need to consider any of the factors in [R.C.] 2151.414(E) because the Court found that [R.C.] 2151.414(B)(1)(d) applies and that permanent custody is in the best interest of the child

under [R.C.] 2151.414(D)(1), the Court has considered the [R.C. 2151.414(E)] factors and makes the following findings:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, *the parent* has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

(4) *The parent* has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so or by other actions showing an unwillingness to provide an adequate permanent home for the child.

(Emphasis added.)

{¶ 38} The juvenile court did not specify whether these findings under R.C. 2151.414(E)(1) and (4) pertained to Mother, Father, or both. Assuming, arguendo, that the juvenile court's R.C. 2151.414(E)(1) finding pertained to Mother, the juvenile court did not specify what problem or condition that Mother failed to remedy (i.e. parenting, domestic violence, substance abuse, etc.). *See, e.g., In re M.W.*, 2017-Ohio-8580, 101 N.E.3d 95 ,¶ 23 (8th Dist.) (in a permanent custody case where mother's case plan included domestic violence services, the juvenile court found that (1) although mother engaged in case plan services, including domestic violence services, she failed to benefit therefrom, and (2) mother had "demonstrated a lack of commitment towards the [children] by failing to end the relationship with the alleged father where she is the victim of [d]omestic [v]iolence.").

{¶ 39} After reviewing the record, we cannot say that that the record contains clear and convincing evidence that permanent custody is in A.T.'s best interest. Specifically, we find that the record lacks clear and convincing evidence that R.C.

2151.414(D)(2)(a) applies — that one or more of the factors set forth in R.C. 2151.414(E) exists with respect to Mother and A.T. cannot be placed with Mother within a reasonable time or should not be placed with Mother. Furthermore, we find that the record lacks clear and convincing evidence that permanent custody is in A.T.'s best interest based on the factors set forth in R.C. 2151.414(D)(1).

{¶ 40} The record reflects that Mother either completed or has taken significant steps toward completing all of her case plan objectives and all of the case plan services to which she was referred. After A.T. was removed from Mother's custody, a case plan was filed with the juvenile court that included objectives for parenting, domestic violence, anger management, substance abuse, and housing. Mother was also referred for domestic violence services on two occasions.

{¶ 41} The record reflects that Mother completed her housing and anger management objectives. Mother was 17 years old at the time A.T. was removed from her custody. She was living at her mother's house. Mother obtained independent housing in October or November 2020. McKether testified, "Mother's home is appropriate. There are no hazards, no visible hazards, no concerns at this time." (Tr. 42.) McKether confirmed that Mother's home is appropriate and meets the child's basic needs. (Tr. 53.)

{¶ 42} Regarding the anger management objective, McKether testified that Mother completed an anger management program through Community Collab. Mother was referred for a mental health assessment. McKether testified that

Mother receives mental health services through Ohio Guidestone and that Mother is compliant with those services.

{¶ 43} Regarding the substance abuse objective, Mother completed an intensive outpatient treatment program through Recovery Resources. Mother submitted urine screens to CCDCFS in 2019, 2020, and 2021. McKether was not aware of any positive screens submitted by Mother after she completed her treatment program. McKether opined that Mother benefitted from her case plan's substance abuse services because she completed a treatment program and consistently submitted negative screens.

{¶ 44} At the time of the June 7, 2021 permanent custody hearing, Mother's most recent negative screen was submitted in March 2021. Mother did complete a screen on June 4, 2021, but the results of that test were not available at the time of the permanent custody hearing. McKether testified that Mother had "not completed screens that were requested for her to complete." (Tr. 37.) McKether confirmed that if the results of the June 4 screen were negative, CCDCFS would feel more comfortable that Mother was maintaining sobriety. Aside from McKether's testimony that Mother missed drug screens, no evidence was presented at the permanent custody hearing that indicated Mother was not maintaining sobriety.

{¶ 45} Mother's March 2020 case plan referenced a concern about her lack of stable income. The record reflects that Mother is employed. McKether testified that Mother works as a home health aide.

{¶ 46} McKether testified that the agency's two biggest concerns regarding Mother were parenting and domestic violence. (Tr. 63.)

{¶ 47} First, regarding the agency's parenting concern, the record reflects that Mother completed one parenting program, and was engaged in a second parenting program at the time of the permanent custody hearing. McKether testified that Mother completed a "regular parenting course" through Recovery Resources shortly after the agency became involved with the family. CCDCFS referred Mother to a second "Nurturing Parenting" program in January 2021. At the time of the permanent custody hearing, Mother had not completed the Nurturing Parenting program. However, McKether acknowledged that Mother had engaged in the program.

{¶ 48} McKether testified about her concerns regarding Mother's visits with the children. McKether was concerned that Mother spent a lot of time on the phone during visits with A.T. McKether acknowledged, however, that Mother would use her cell phone to facilitate FaceTime calls between A.T. and Mother's mom and sister.

{¶ 49} McKether was also concerned that Mother was not bonding with the children during visits and not "displaying any emotions towards the children." (Tr. 40.) The children's GAL also testified that A.T. "was not bonded with [Mother]." (Tr. 102.)

{¶ 50} CCDCFS Social Worker McAnerney testified that she was assigned to the case in May 2021, approximately one month before the permanent custody

hearing.  McAnerney was the case worker of record at the time of the permanent custody hearing.

**{¶ 51}** McAnerney observed approximately three visits between Mother and A.T. at Mother's home.  During the first visit, Mother brought a gift for A.T.  During the third visit, McAnerney testified that A.T. was "fighting and pretty much crying and not wanting to go [to the visit]."  (Tr. 81-82.)  When A.T. went inside Mother's home, Mother tried to calm A.T. down and reassured her that everything was okay.  McAnerney's testimony demonstrates that Mother was working on developing her bond with A.T. and displaying emotion towards A.T. by comforting her.

**{¶ 52}** At the time of the permanent custody hearing, CCDCFS's concerns about Mother's parenting were based on (1) Mother not consistently participating in visits, (2) an April 2021 incident during which Mother asked A.T., who was two years old at the time, to watch J.H. while Mother made him a bottle, and (3) Mother's continued relationship with Father.

**{¶ 53}** Regarding Mother's inconsistent participation in visitation, McKether testified that Mother was not consistent with visitation before J.H. was born in November 2020.  After J.H. was born, however, Mother's involvement with visitation and the children "absolutely" changed, and Mother became consistent with visitation.  (Tr. 65.)

**{¶ 54}** When J.H. was born in November 2020, the visits between Mother, A.T., and J.H. were initially virtual.  During these virtual visits, McKether opined

that Mother was not focused. Nevertheless, McKether acknowledge that Mother did engage with the children during the virtual visits.

{¶ 55} In approximately April 2021, the visits went from virtual to in-person. The in-person visits were appropriate.

{¶ 56} The agency was concerned about the April 2021 incident during which Mother asked A.T. to watch J.H. while Mother left the room to make a bottle. McKether acknowledged that J.H. was secured in a seat at the time Mother asked A.T. to watch him. The children were in the living room, and Mother went into the kitchen to make a bottle. Although Mother was unable to see into the living room from the kitchen, McKether acknowledged that Mother was close enough to hear the children. It took Mother approximately two minutes to make the bottle.

{¶ 57} As noted above, Mother completed the Recovery Resources parenting program and was engaged in the Nurturing Parenting program. McKether opined, however, that Mother did not benefit from her parenting services.

{¶ 58} As noted above, McAnerney observed approximately three visits between A.T. and Mother. During the first visit, Mother gave "[J.H.] a bottle and she had set him up in the child chair and then made the bottle and propped it up with a blanket and walked away from him." (Tr. 80.) McAnerney corrected Mother and explained that it would be unsafe to feed the baby that way because the baby could choke. Mother corrected her behavior and McAnerney did not see her use the blanket again during a feeding.

{¶ 59} McAnerney also testified that Mother brought a gift for A.T. to the first visit. The gift was a small necklace. A.T. put the necklace into her mouth, and McAnerney advised Mother that the necklace could also pose a choking hazard. Following this advisement, there were no further incidents regarding the necklace.

{¶ 60} During the third visit, A.T. "was fighting and pretty much crying and not wanting to go [to the visit]." (Tr. 81-82.) When A.T. was inside the home, however, Mother tried to calm A.T. down, and assured her that the foster parents would be back soon.

{¶ 61} As noted above, the juvenile court did not specify which R.C. 2151.414(D)(1) factor or factors based upon which it concluded that an award of permanent custody was in the child's best interest. To the extent that the juvenile court's findings under R.C. 2151.414(D)(1), (D)(2)(a), or R.C. 2151.414(E)(1) and (4) pertain to CCDCFS's parenting concern, these findings are not supported by clear and convincing evidence in the record.

{¶ 62} Neither Mother's inconsistent visitation before November 2020 nor the April 2021 incident warrant the "remedy of last resort" — permanently terminating Mother's parental rights. *See In re M.S.*, 2015-Ohio-1847, 34 N.E.3d 420, at ¶ 58. Mother, who was a child herself when A.T. was removed from her custody, was trying her best to multitask, as all parents have to do at one point or another, while caring for A.T. and J.H. at the same time.

{¶ 63} Mother completed her first parenting program, and she was engaged in a second parenting program at the time of the permanent custody hearing.

McAnerney's testimony demonstrates that Mother did, in fact, benefit from her parenting programs. When Mother was made aware that her actions could be dangerous, she corrected her behavior. McAnerney's testimony also demonstrates that Mother was developing her bond with A.T. and displaying emotions towards the child.

{¶ 64} Based on the foregoing analysis, the record reflects that Mother had taken significant steps toward completing her parenting objective and remedying this condition based upon which A.T. was initially removed. Furthermore, Mother managed to make significant progress towards completing her case plan objectives and remedying all of the conditions that caused A.T.'s removal despite the ongoing COVID-19 pandemic and pandemic-related restrictions. By doing so, Mother demonstrated her commitment toward A.T. and her willingness to provide an adequate permanent home for the child.

{¶ 65} Second, regarding the agency's domestic violence concern, McKether testified that "earlier in 2020" there was a domestic violence incident between Mother and Father. (Tr. 20.) As a result, the agency made a first referral for domestic violence counseling through Able Counseling. Mother completed the first domestic violence program.

{¶ 66} After the first domestic violence referral, there were additional domestic violence incidents between Mother and Father. Mother and Father were involved in a car crash in November 2020. At the time, Father was driving a stolen

car.  Mother, who was nine months pregnant, sustained a broken foot, and Father left her at the scene.

{¶ 67} During a CCDCFS telephone staff meeting regarding J.H., Mother initially spoke.  However, Father took over and the agency did not hear from Mother again during the call.  McKether explained that Father was "very controlling. [Mother] was not able to speak for herself.  She was not able to defend herself." (Tr. 72.)

{¶ 68} The agency was granted emergency temporary custody of J.H.  When CCDCFS personnel went to the hospital to pick the child up, they learned that Father "was asked to be removed from the hospital."  McKether explained, "[w]hile we were there picking up [J.H., Father] somehow got past security and was on the Labor and Delivery floor.  The Agency did have to request a security escort to leave the premises, and during that time[, Mother] also requested a police escort.  She stated that she was afraid."  (Tr. 22.)

{¶ 69} A final incident occurred in December 2020.  During this incident, Mother stabbed Father.  McKether acknowledged on cross-examination that a determination had been made Mother acted in self-defense.  (Tr. 50.)  She requested the police report pertaining to this incident but did not receive it.  Following this incident, Father was arrested and incarcerated.  The record reflects that Father is not eligible for release until December 2022.  (Tr. 10.)

{¶ 70} McKether had no knowledge of any contact between Mother and Father after the December 2020 incident.  In January 2021, McKether spoke with

Mother about whether she intended to stay involved with Father. Mother indicated that she did not speak with Father and "she didn't plan on it at that time." (Tr. 43.)

{¶ 71} McKether testified that the agency is concerned with Father because he has "a propensity of violence" and "a strong criminal history." (Tr. 43.) Father did not engage in any case planning services.

{¶ 72} Following the November and December 2020 incidents, a second domestic violence referral was made through Ohio Guidestone. At the time of the permanent custody hearing, Mother was still engaged in counseling with Ohio Guidestone. Mother did not provide a certificate of completion to McKether from the second domestic violence referral through Ohio Guidestone. McKether acknowledged, however, that Mother could have completed the second program.

{¶ 73} Although Mother completed domestic violence services on two occasions, McKether opined that Mother did not benefit from the domestic violence services. McKether explained that Mother "continued to maintain a relationship with [Father], and the only reason that [Mother] did stop is because he is incarcerated." (Tr. 40.)

{¶ 74} The children's GAL also expressed concern about Father. In recommending that permanent custody be granted to CCDCFS, the children's GAL asserted, "I am very concerned about [Father]. He is a threat. I don't, unfortunately, think that [Mother] can resist him to protect herself or the children from him. * * * [He will] get out of jail." (Tr. 103.)

{¶ 75} To the extent that the juvenile court's findings under R.C. 2151.414(D)(1), (D)(2)(a), or R.C. 2151.414(E)(1) and (4) pertain to CCDCFS's domestic violence concern, these findings are not supported by clear and convincing evidence in the record. Mother completed her first domestic violence class, and was engaged in counseling through a second domestic violence referral at the time of the permanent custody hearing.

{¶ 76} The record reflects that Mother benefitted from her domestic violence programming. There was no evidence of any contact between Mother and Father during the six months between the December 2020 incident and the permanent custody hearing. There was no indication that Mother visited or attempted to visit Father in prison, nor that any correspondence was exchanged between them. Mother expressed to McKether in January 2021 that she did not intend to speak to or remain involved with Father moving forward. Furthermore, the record reflects that Mother took affirmative steps to disassociate from Father by prosecuting abuse charges against him.

{¶ 77} Accordingly, the record reflects that Mother had taken significant steps towards completing her domestic violence objective and remedying this condition based upon which A.T. was initially removed. Furthermore, by ending the relationship with Father following the December 2020 incident, Mother demonstrated her commitment toward A.T. and her willingness to provide an adequate permanent home for the child.

{¶ 78} CCDCFS's and the children's GAL's concerns about domestic violence are certainly justified given the history of this case. However, these concerns appear to rest more on speculation about the possibility that Mother will reengage with Father upon his release from prison, rather than clear and convincing evidence of a likelihood that they will reengage. *See In re M.S.*, 2015-Ohio-1847, 34 N.E.3d 420, at ¶ 59. In the event that Father engages in additional threats or acts of violence upon his release from prison, Mother can protect herself and the children by filing a petition for a civil protection order against Father.

{¶ 79} For all of the foregoing reasons, we are unable to conclude that the record contains clear and convincing evidence that terminating Mother's parental rights and awarding permanent custody to CCDCFS is in A.T.'s best interest at this time. Accordingly, the juvenile court abused its discretion in terminating Mother's parental rights and determining that permanent custody was in A.T.'s best interest.

{¶ 80} Mother's first and second assignments of error are sustained.

{¶ 81} The juvenile court's judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover of appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., JUDGE

ANITA LASTER MAYS, P.J., and
EILEEN A. GALLAGHER, J., CONCUR