[Cite as *In re M.G.*, 2022-Ohio-1077.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE: M.G. | : | |
| | : | No. 111144 |
| A Minor Child | : | |
| | : | |
| [Appeal by Ma.G., Father] | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 31, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-19-901850

---

### *Appearances:*

Cullen Sweeney, Cuyahoga County Public Defender, and Britta Barthol, Assistant Public Defender, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant-father, Ma.G. ("Father"), appeals the juvenile court's decision terminating his parental rights and granting permanent custody of his minor child to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "agency"). He raises the following assignment of error for review:

The trial court abused its discretion when it awarded permanent custody to CCFCFS as the decision is against the weight of the evidence and is not supported by clear and convincing evidence.

{¶ 2} After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

## I. Procedural and Factual History

{¶ 3} Father and A.B. ("Mother") are the biological parents of the minor child, M.G. (d.o.b. 02/06/2019).

{¶ 4} On February 13, 2019, CCDCFS filed a complaint alleging that M.G. was an abused and dependent child based on the following relevant particulars:

1. Mother used opiates and cocaine during her pregnancy with the child. The child has remained hospitalized since birth due to suffering from withdrawal symptoms.

2. Mother has a substance abuse disorder related to opiates and cocaine which prevents her from providing a safe home for the child. Mother has participated in substance abuse treatment in the past but has failed to maintain her sobriety.

3. Mother does not have stable housing in which to provide shelter for the child.

4. Alleged father, [Ma.G.], has repeatedly been physically abusive to Mother. Mother continues to maintain a relationship with the alleged father despite knowing his propensity for violence.

5. Mother and [Ma.G.] have an older child who was adjudicated abused and neglected, due in part to Mother's substance abuse and domestic abuse violence between the parents.

6. [Ma.G.] has an anger management problem which prevents him from providing a safe home for the child.

7. [Ma.G.] has pending charges for aggravated vehicular homicide, having weapons while under disability, and aggravated vehicular assault.

8. On November 27, 2017, [Ma.G.] was convicted of trafficking in heroin and trafficking in cocaine.

9. [Ma.G.] has not yet established paternity.[1]

{¶ 5} On February 26, 2019, the child was committed to the predispositional temporary custody of CCDCFS. On April 17, 2019, the court determined that the allegations of the amended complaint were proven by clear and convincing evidence. Accordingly, M.G. was adjudicated as an abused and dependent child.

{¶ 6} A dispositional hearing was held on June 19, 2019. At the conclusion of the hearing, the magistrate committed M.G. to the temporary custody of CCDCFS, stating, in relevant part:

> The court finds that the child's continued residence in or return to the home of [Mother], would be contrary to the child's best interests.
>
> The court finds that [CCDCFS] has made reasonable efforts to prevent the removal of the child, to eliminate the continued removal of the child from her home, or to make it possible for the child to return home. These efforts are: substance abuse assessment and treatment as recommended, mental health services, assistance in finding adequate housing and domestic violence classes.

The magistrate's decision was affirmed, approved, and adopted by the juvenile court on July 9, 2019.

{¶ 7} On January 27, 2020, the agency filed a motion to extend temporary custody for a period of six months based on the progress Mother was making towards reunification. However, on May 12, 2020, CCDCFS withdrew its motion to

---

[1] The complaint was amended prior to the adjudication hearing. The allegations levied against Father, however, were substantially consistent with the allegations posed in the original complaint.

extend temporary custody and moved the court to modify the order of temporary custody to an order of permanent custody. The motion was supported by the affidavit of CCDCFS social worker, Melanie Green ("Green"), who averred, in pertinent part:

> A case plan was filed with the juvenile court and approved which required that Mother complete a drug and alcohol assessment and follow any treatment recommendations. Additionally, the case plan required Mother complete domestic violence counseling and obtain appropriate housing.
>
> Mother lacks appropriate housing and lives with an active drug user. Although Mother has engaged in substance abuse services she tested positive for cocaine in January 2020. Mother has refused to complete random drug screens as requested by the agency.
>
> Mother has not visited with the child since the beginning of February 2020.
>
> The case plan required that Father complete a drug and alcohol assessment and follow any treatment recommendations. Additionally, the case plan required that Father complete domestic violence counseling, obtain appropriate housing, and establish paternity.
>
> Father established paternity but has not participated in other case-plan services. He is currently incarcerated and his stated release date is January 2023.

{¶ 8} On December 4, 2020, the child's paternal grandmother, S.M., filed a motion to intervene and a motion for legal custody. S.M. attached a signed Statement of Understanding to her motion for legal custody, expressing that she was ready, willing, and able to assume legal responsibility for the care and supervision of M.G.

{¶ 9} On February 3, 2021, the trial court denied S.M.'s motion to intervene, finding "[S.M.] has not stood in loco parentis to her grandchild, nor exercised

significant parental control over or assumed parental duties for the benefit of her grandchild."

{¶ 10} On March 29, 2021, Father filed a motion for legal custody in favor of paternal grandmother pursuant to R.C. 2151.353(A)(3). Father alleged that legal custody in favor of S.M. was in the child's best interests and was the least restrictive alternative to permanent custody.

{¶ 11} On November 9, 2021, the matter proceeded to a hearing on the outstanding motions. At the hearing, Green outlined the parents' history with the agency and stated that she was originally assigned to the case in July 2017, during the custody proceedings involving M.G.'s older sibling, A.G. Green testified that once A.G. was placed in the legal custody of his paternal aunt, R.M., the agency continued to work with Mother to address the issues that caused A.G. to be removed from her care. At the time of M.G.'s birth, the agency continued to have ongoing concerns with Mother's housing situation and her sobriety. Accordingly, M.G. was committed to the agency's emergency temporary custody the day she left the hospital. She has continuously remained in the care of a licensed foster home since February 26, 2019. M.G., who was two-years old at the time of trial, was fully integrated into her foster family. Green testified that M.G. referred to her foster parents as "Mommy" and "Daddy," and was bonded with her foster parents' adopted child. (Tr. 40.) The foster parents were interested in adoption and were open to "maintaining family bonds with all appropriate family members." (Tr. 41.)

{¶ 12} Once M.G. was removed from the parents' care, a case plan for reunification was developed to assist Mother and Father in addressing the issues that led to the child's removal. Green testified that Mother failed to comply with her case plan objectives, including Mother's obligation to complete services for substance abuse, domestic violence, and housing. Specifically, Mother failed to attend services for domestic abuse counseling and continued to test positive for "high levels of cocaine" between December 2, 2020, and January 12, 2021. Mother had not submitted to a drug screen since February 2021. In addition, Green testified that she was unaware of Mother's current housing situation and had not spoken to Mother in person since May 2021. Given Mother's lack of communication with the agency, Green stated that she did not know where Mother was currently living, did not know whether she was working, and did not know whether she was sober.

{¶ 13} With respect to Father, Green testified that his case plan included services to address issues with substance abuse, domestic violence, and stable housing. Green stated Father is currently serving a four-year prison sentence and has been incarcerated since July 2019. Green testified that prior to his incarceration, Father had the opportunity to work towards reunification, but "refused to participate in the case plan services." (Tr. 21.)

{¶ 14} Green confirmed that CCDCFS attempted to identify a relative for placement following M.G.'s removal, but was unsuccessful because identified relatives were either unsuitable for placement or were unwilling to care for the child. Regarding the child's paternal grandmother, S.M., Green testified that S.M. has

continuously expressed interest in obtaining custody of M.G. Green acknowledged that S.M. visited the child approximately 50 to 52 times throughout 2019. However, the agency was not comfortable recommending her for placement based on information gathered during the agency's investigation during the custody case involving A.G. Green explained that, at the time of the child's birth,

> [S.M.] had an open case with our agency in regards to domestic violence between her and her spouse with one of Father's other children present at the time, so she did not meet the Ohio Adm.Code standards to be recommended for placement.

(Tr. 25-26.) This incident prompted the agency to have concerns with S.M.'s proximity to her spouse given his criminal history and his continued residence in S.M.'s home. (Tr. 83-84.) Green testified that CCDCFS also had concerns with S.M.'s judgment, including her decision to leave A.G. in Mother's care during a time period when Mother "was actively using heroin." (Tr. 27.) Finally, Green testified that the agency had concerns with S.M.'s physical health. Green noted that S.M. was often in poor health during the pendency of this case and, in fact, was hospitalized at the time A.G. was removed from Mother's care.

{¶ 15} Green testified that once the agency requested permanent custody, she was contacted by the child's paternal aunt, Sh.M., in May 2021. According to Green, Sh.M. indicated that she was interested in obtaining custody of M.G. "solely because nobody else in the family is able to provide care or able to get custody of [M.G.]" (Tr. 30.) Green stated that Sh.M. was fingerprinted, completed a home-study investigation, and participated in adoption classes. M.G. also began attending

supervised visits with Sh.M. in her home in September 2021. At the time of the permanent-custody hearing, M.G. had completed three visits with Sh.M. Green testified that M.G. had not yet bonded with Sh.M., but was becoming more comfortable with Sh.M. and her home. Despite the foregoing, however, Green testified that she was not aware of "any petition/motion pending before the court for legal custody of [M.G.] to [Sh.M.]" (Tr. 81.) Accordingly, Green opined that it was in the child's best interests to terminate Mother and Father's parental rights and award the agency permanent custody.

{¶ 16} S.M. testified on behalf of Father. S.M., then 64 years old, testified that she has resided in her current home for approximately four to five years and obtained ownership of the home three years ago when Father transferred her the title to the home. S.M. was questioned at length about her background, including her employment status and criminal history. S.M. was also questioned about her relationship with her spouse and the domestic violence incident that raised concerns with the agency. S.M. maintained that the argument was not physical and that contrary to Green's testimony, her spouse has not lived in her home for approximately one and one-half years.

{¶ 17} Regarding M.G., S.M. expressed her willingness to serve as the child's legal custodian. She confirmed that she signed a Statement of Understanding on December 4, 2020, and understood that if she were granted legal custody of the child, she would be accepting legal responsibility for the care and supervision of M.G. until she reaches the age of majority. S.M. testified that she still wanted M.G.

to live with her. However, she acknowledged that M.G. might be better off with Sh.M. because "she's younger." Nevertheless, S.M. testified that if she were granted legal custody, she would have a strong support system and family members who are willing to assist her when necessary.

{¶ 18} At the close of trial, the court heard from the child's guardian ad litem, Carla Golubovic, Esq. ("GAL"). Consistent with the recommendations of the social worker, the GAL recommended that permanent custody be granted in favor of CCDCFS, stating, in relevant part:

> I do not believe that either the mother, [A.B.], or the father, [Ma.G.], are able to parent this child. Mother is compromised by addiction, homelessness. She's not presented for at least two years in this matter. Her compliance with case plan objectives over the year 2021 is unknown. I've not been in contact with her but one time. I have no idea as the guardian ad litem what she's currently doing, where she lives, how she is physically.

> With regard to [Father], he's incarcerated for vehicular homicide. He is not able to provide for this child.

(Tr. 135.) The GAL further opined that it would not be in the child's best interests to be placed in the legal custody of S.M. Specifically, the GAL raised concerns with S.M.'s present ability to care for M.G. when she conceded that she would be dependent on assistance from her daughters, R.M. and Sh.M.

{¶ 19} On November 19, 2021, the juvenile court granted the agency's request for permanent custody and dismissed all remaining motions as moot. The juvenile court found, by clear and convincing evidence, that it is in the best interests of the child to be placed in the permanent custody of CCDCFS. The court further made alternative findings under R.C. 2151.414(B)(1)(a)(b) and (d), stating:

The child cannot be placed with either parent within a reasonable time or should not be placed with the parents. This factor is discussed as part of the (E) factors of R.C. 2151.414 below.

The child is abandoned. The mother has not visited or had contact with the child since March 2021. The father has been incarcerated since at least July 2019 when he was sentenced to four years in prison for aggravated vehicular assault and having a weapon while under disability.

The child has been in the temporary custody of CCDCFS for twelve or more months of a consecutive twenty-two-month period. As stated above, this matter was opened on February 13, 2019, when the complaint was filed and the child was committed to the emergency temporary custody of the agency on February 27, 2019, when the child was released from the hospital following her birth. The permanent custody motion was filed on May 12, 2020.

{¶ 20} Father now appeals from the juvenile court's judgment.

## II. Law and Analysis

## A. Termination of Parental Rights

{¶ 21} In his sole assignment of error, Father argues the juvenile court's judgment is against the manifest weight of the evidence. Father contends "that the record lacks competent, credible evidence to support the court's finding that a grant of permanent custody to the agency is in the best interests of his daughter."

{¶ 22} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "'fundamental liberty interest' in the care, custody and management" of his or her child, *In re Murray*, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and the right to raise one's own child is "'an essential and basic civil right.'"

*In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 23} Because the termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" it is "an alternative [of] last resort." *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 776 N.E.2d 485, ¶ 14 (2002); *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

{¶ 24} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong of this statute authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e).

{¶ 25} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 26} "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains some competent, credible evidence from which the court could have found that the

essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.,* 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.,* 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16. "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.,* 8th Dist. Cuyahoga No. 99931, 2014-Ohio-2051, ¶ 28, quoting *Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶ 27} With respect to the first prong of the permanent-custody analysis, the juvenile court made alternative findings under R.C. 2151.414(B)(1)(a)(b) and (d), concluding that (1) M.G. is an abandoned child, (2) M.G. cannot be placed with either parent within a reasonable time or should not be placed with either parent, and (3) M.G. has been in the temporary custody of CCDCFS for 12 or more months of a consecutive 22 month period.

{¶ 28} On appeal, Father does not contest the juvenile court's findings under R.C. 2151.414(B)(1). For clarity, however, we find competent, credible evidence supports the juvenile court's finding pursuant to R.C. 2151.414(B)(1)(d) that M.G. has been in an agency's temporary custody for 12 or more months of a consecutive 22-month period.

{¶ 29} For purposes of calculating time under subsection (d), R.C. 2151.413(D)(1) provides that "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after

the removal of the child from home." In this case, M.G. was initially removed from the parents' care on February 26, 2019, and was adjudicated as an abused and dependent child on April 17, 2019. She remained in the emergency temporary custody of the agency until she was committed to the temporary custody of the agency on July 9, 2019. Here, the earliest date was 60 days after M.G. was removed from her home, or April 27, 2019. Thus, at the time the agency filed its motion for permanent custody on May 12, 2020, M.G. had resided in the temporary care of the agency for at least 12 months. Because the time requirements under R.C. 2151.414(B)(1)(d) were satisfied, it was unnecessary for the court to determine whether R.C. 2151.414(B)(1)(a) or (b) were applicable to the circumstances presented in this matter. *See In re L.W.*, 8th Dist. Cuyahoga No. 107648, 2019-Ohio-1344, at ¶ 15, citing *In re C.W.,* 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21.

{¶ 30} Turning to the second prong of the permanent-custody analysis, we recognize "[t]he discretion that the juvenile court enjoys in [deciding] whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's [decision] will have on the lives of the parties concerned." *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994). Thus, we review a juvenile court's determination of a child's best interests under R.C. 2151.414(D) for abuse of discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or

unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 31} In determining the best interests of a child at a hearing held pursuant to R.C. 2151.414(A)(1), the juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 32} Although a juvenile court is required to consider each relevant factor under R.C. 2151.414(D)(1) in making a determination regarding permanent custody, "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Moreover, the Ohio Supreme Court has clarified that

R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires.

*In re A.M.*, Slip Opinion No. 2020-Ohio-5102, ¶ 31.

{¶ 33} In this case, the juvenile court expressed that it considered all relevant factors under R.C. 2151.414(D)(1) in determining that an award of permanent custody to the agency was in the child's best interest. In its judgment entry, the court emphasized that M.G. has remained in the custody of the agency since the moment she left the hospital following her birth. The court further discussed the various factors supporting the court's determination that M.G. is an abandoned child, including Mother's ongoing chemical dependency and Father's incarceration. Finally, in assessing the recommendations of the GAL and whether legally secure placement could be achieved without a grant of permanent custody to the agency, the court stated, in relevant part:

> The child was removed from the hospital following her birth and placed with the foster family with whom she still lives, two and a half years later. She refers to her foster parents as "Mommy" and "Daddy" and this is the only family she has known since she came home from the hospital following her birth. She is very attached to her foster parents and her foster sibling, and this is an adoptive placement.
>
> * * *
>
> The Guardian ad litem for the child recommends that permanent custody is in the child's best interests. The GAL for this child was also the GAL for the child's biological sibling, A.G. A.G. was placed in the legal custody of a paternal aunt, but the GAL's investigation and the testimony at trial established that A.G. spends a very significant amount of time (days per week) in the care of his paternal grandmother. The testimony of the proposed legal custodian established that if she was granted legal custody of this child, her daughters would provide the care for the child. It is this daughter, but

not the grandmother/proposed legal custodian, who has visited the child three times since September of 2021. The grandmother has not visited the child since 2019. However, only the grandmother has been identified in a written motion for legal custody. Moreover, the social worker was very clear that CCDCFS did not and could not recommend legal custody to the paternal grandmother based on concerns of domestic violence between her and her spouse when A.G. was present, based on issues of judgment when the mother was living with grandmother over the course of this child's and A.G.'s cases. It is not clear who actually owns the grandmother's house, and based on the testimony, the court shares the concerns of the social worker for CCDCFS, and the child's GAL about the stability of this situation.

{¶ 34} After careful consideration of the testimony presented at the permanent custody hearing, we find there is competent, credible evidence in the record to support the juvenile court's reliance on the factors set forth under R.C. 2151.414(D) and its conclusion that permanent custody to the agency is in child's best interests.

{¶ 35} First, with respect to the child's relationship with her parents, siblings, relatives, and foster parents, Green testified that Mother's relationship with her child has been negatively impaired by her unresolved substance abuse addiction and her sudden absence from M.G.'s life. Green stated Mother's "visitation attendance has been poor since November 2020," and that her last visit with the child occurred on March 18, 2021. (Tr. 23.) Similarly, Father's ability to interact with M.G. has been significantly impaired by his incarceration in July 2019. The record contains minimal information concerning the scope and nature of Father's relationship with the child. However, Green and the GAL each opined that Father was unable to parent the child due to his ongoing term of imprisonment and his past behavior.

Regarding S.M., Green conceded that she consistently visited M.G. throughout the entirety of 2019. However, due to circumstances beyond S.M.'s control, including the COVID-19 pandemic, S.M. was unable to visit the child in 2020 and the majority of 2021. Green confirmed that S.M. was present for portions of M.G.'s three visits in Sh.M.'s home. However, Green testified that M.G. did not interact with S.M. and would not be capable of identifying S.M. as a person she knew.

{¶ 36} In contrast, Green testified that M.G. has bonded with her foster family and has lived under their care for her entire life. She refers to her foster parents as "Mommy" and "Daddy," and interacts with their adopted child as a sibling. The foster parents have expressed their love for M.G. and their commitment to her long-term care.

{¶ 37} With respect to the wishes of the child, the GAL recommended that the court grant permanent custody in favor of CCDCFS based on the GAL's familiarity with the parents and their inability to remedy the issues that led to the removal of M.G. and A.G. from their care. The GAL further opined that she did not believe legal custody to paternal grandmother was in the child's best interests. The GAL explained that she had concerns with S.M.'s ability to care for the child without substantial assistance, stating:

> You Honor, [S.M.] is a kind woman, but I do not believe that it is in the child's best interest to be in her legal custody. I was also the guardian ad litem for the minor child [A.G.]. My understanding and my observation of what has transpired with the entire family since the commitment of [A.G.] with legal custody of his aunt is that he's kind of a community child and he's often with grandmother as she stated, and often with other relatives which there's no problem with that

necessarily, but it is my understanding from speaking with [Sh.M.], [R.M.], and [S.M.], that this is the plan. The familial plan for [M.G.] is to kind of be again a community baby and if she's committed to the legal custody of [S.M.], that often means she's gonna be with one or another relative. Your Honor, I don't believe that's in the child's best interest.

(Tr. 136.)

{¶ 38} The record further supports the court's conclusion that M.G.'s custodial history weighed heavily in favor of an award of permanent custody. There is no dispute that M.G. was placed with the foster family immediately following her release from the hospital. Following her placement with the agency, Mother and Father each failed to take the necessary steps to remedy the problems that caused M.G. to be removed from their care. As a result, M.G. remained in the agency's custody for approximately 32 months before the permanent-custody hearing commenced.

{¶ 39} Finally, as to whether the child's need for a legally secure permanent placement could be achieved without a grant of permanent custody, Father argues that the award of legal custody to paternal grandmother is a legally secure placement that is both in the child's best interest and necessary to preserve family unity and blood relationships. Father submits that the juvenile court's judgment may result in "devastating long-term consequences," stating:

> If the agency is to receive permanent custody of M.G., the child will lose all contact, along with the connection she has with her family, which includes her grandmother, her aunts, and her cousins. * * * There is no reason to deny M.G. the right to be part of her extended family where she can benefit from having a shared family history and where she can participate in her family's traditions and learn her culture. If M.G. is

severed from her family, she will always have questions as to her social and cultural background.

{¶ 40} Preliminarily, we note that "the issue facing the trial court at the permanent custody hearing [is] not whether the child should have been placed with [the proposed legal custodian]; rather, the issue [is] whether the agency's motion for permanent custody should be granted." *In re C.H.*, 8th Dist. Cuyahoga No. 103171, 2016-Ohio-26, ¶ 26. The willingness of a relative to care for a child does not alter what a court must consider when determining whether to grant permanent custody. *See, e.g., In re T.H.*, 8th Dist. Cuyahoga No. 107947, 2019-Ohio-3045, ¶ 13; *In re Tr.T.*, 8th Dist. Cuyahoga No. 102071, 2015-Ohio-4177, ¶ 19; *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 61. Thus, "courts are not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody.'" *In re S.F.*, 2d Dist. Montgomery No. 28606, 2020-Ohio-693, ¶ 50, quoting *In re A.A.*, 2d Dist. Greene No. 2008 CA 53, 2009-Ohio-2172, ¶ 19.

{¶ 41} Relevant to this appeal, the Supreme Court of Ohio has also recognized that there is no heightened importance to the R.C. 2151.414(D)(1)(d) factor and the trial court's statutory duty does not include a requirement that the juvenile court find by clear and convincing evidence that no suitable relative is available for placement. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, at ¶ 56, 64. However, "'[t]he possibility that a relative could provide a permanent placement for a child by assuming legal custody is relevant to the consideration of

the R.C. 2151.414(D)(1)(d) best-interest factor,'" i.e., the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. *In re E.M.B.T.*, 8th Dist. Cuyahoga No. 109479, 2020-Ohio-4308, ¶ 23, quoting *In re J.P.,* 10th Dist. Franklin No. 18AP-834, 2019-Ohio-1619, ¶ 27.[2]

{¶ 42} As acknowledged by Green and the child's GAL, the issues raised before at the permanent custody hearing were delicate and required the court to confront difficult questions when considering the best interests of the child. The testimony presented at trial demonstrated that M.G. has family members who care deeply about her interests and her well-being. M.G.'s paternal relatives have worked as a unit to ensure that M.G.'s older sibling, A.G., is provided a safe and stable home life. Collectively, the paternal relatives have shown a willingness to support their grandchildren, nieces, and nephews, even when such efforts have not been reciprocated by the children's biological parents.

---

[2] Citing *In re Tr.T.*, 8th Dist. Cuyahoga No. 107947, 2019-Ohio-3045, at ¶ 17, and *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, at ¶ 42, the agency asserts that Father cannot challenge the juvenile court's failure to award legal custody to S.M.; rather, his challenge is limited to whether the juvenile court's decision to terminate his parental rights was proper. We agree that our inquiry is limited to the juvenile court's termination of Father's parental rights and not whether the court erred in dismissing the motion for legal custody to a third party as moot. However, the foregoing decisions do not preclude this court from assessing a relative's ability to provide the child a legally secure placement when reviewing the juvenile court's best interest determination. Nor were the decisions intended to do so. As this court has consistently explained, because "'[t]he possibility that a relative could provide a permanent placement for a child by assuming legal custody is relevant to the consideration of the R.C. 2151.414(D)(1)(d) best-interest factor, * * * a parent has standing to raise arguments regarding the possibility of a relative assuming legal custody of a child * * * to the extent those arguments challenge the decision to terminate the parent's rights.'" *In re E.M.B.T.* at ¶ 23, quoting *In re J.P.* at ¶ 27, citing *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 16 (8th Dist.).

{¶ 43} However, the fact remains that M.G. has no bond or relationship with her paternal grandmother. M.G. was less than one-year old the last time she and S.M. had any significant interactions. In contrast, M.G. has developed a loving relationship with the family that has raised her since birth — the only family she has ever known — including her adoptive sibling, with whom M.G. has developed a strong bond. Moreover, this court shares the juvenile court's concerns with S.M.'s past judgment and whether she is presently able to care for the child without substantial assistance of other family members who have not formally committed to the legal care of the child. Under these circumstances, we cannot say that the juvenile court acted unreasonably, arbitrarily, or unconscionably in determining that it was in M.G.'s best interest to grant permanent custody to the agency. *See In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, at ¶ 61, citing *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, at ¶ 11 ("[I]f permanent custody to the agency is in [a child's] best interest, legal custody to [a relative] necessarily is not.").

{¶ 44} The juvenile court's award of permanent custody to CCDCFS is supported by clear and convincing evidence in the record and is not against the manifest weight of the evidence. Accordingly, Father's sole assignment of error is overruled.

{¶ 45} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EMANUELLA D. GROVES, J., CONCUR